IN THE SUPREME COURT OF TENNESSEE
AT NASHVILLE
June 13, 2001 Session

## JOHNIE N. GIBSON v. DOUGLAS TRANT, ET AL.

**Appeal from the Circuit Court for Knox County**
**No. 3-399-93   Wheeler A. Rosenbalm, Judge**

—————————

**No. M1999-00390-SC-R11-CV - Filed October 5, 2001**

—————————

This case presents the question whether a criminal defendant must obtain post-conviction relief in order to maintain a legal malpractice action against his defense lawyer (what is often referred to as a "criminal malpractice" action). The trial court held that he must. Since the plaintiff in the malpractice case here was denied post-conviction relief, the court dismissed his claim against his former defense lawyers. The Court of Appeals affirmed. We now affirm. Along with the large majority of courts to address this issue, we adopt the rule that a plaintiff in a criminal malpractice action must show he has been exonerated. To meet this requirement, the plaintiff must obtain post-conviction relief. Because the plaintiff did not obtain such relief, the courts below correctly ruled that the defendants are entitled to summary judgment.

**Tenn. R. App. P. 11 Application for Permission to Appeal; Judgment of the
Court of Appeals Affirmed**

FRANK F. DROWOTA, III, C.J., delivered the opinion of the court, in which, RILEY ANDERSON, JANICE M. HOLDER, and WILLIAM M. BARKER, JJ., joined. ADOLPHO A. BIRCH, JR. filed a concurring/dissenting opinion.

Gerald C. Russell, Nashville, Tennessee, for the appellant, Johnie N. Gibson.

Jeffrey A. Woods, Knoxville, Tennessee, for the appellees, Douglas Trant and Jerry Cunningham.

**OPINION**

**Background**

On August 16, 1989, Johnie N. Gibson ("Gibson"), along with numerous co-defendants, was charged with committing drug-related offenses in a multi-count indictment in the U.S. District Court

for the Eastern District of Tennessee. Gibson hired Jerry Cunningham ("Cunningham") to represent him, and Cunningham brought in Douglas Trant ("Trant") to assist with the case.

Gibson alleges that Trant and Cunningham asked him to persuade his co-defendants to hire them as well, "telling [Gibson] that none of the Co-Defendants could plead out and testify against him if they were under Trant and Cunningham's representation . . . that if they could get the other Co-Defendants 'under the same umbrella' they would united stand [sic]." A total of seven co-defendants ultimately hired Trant and Cunningham to represent them. Gibson alleges that this joint representation, engendered through unethical persuasive tactics, created a "severe" conflict of interest.

Gibson further alleges that Trant and Cunningham pressured him to plead guilty. Specifically, he claims that Trant told him that a failure to plead guilty would cause the federal prosecutors to file charges against his elderly father. Gibson claims he agreed to plead guilty to avoid this result. Trant also allegedly told him not to tell the federal district court judge during the plea hearing that the government threatened to prosecute his father; if he did mention the threat, the judge would not accept the guilty plea and the government would carry out its threat. Finally, Gibson alleges that Trant told him he would receive a sentence of eight to ten years.

After Gibson entered the guilty plea, the district court sentenced him to twenty years without the possibility of probation or parole, the minimum sentence according to the federal sentencing guidelines. Gibson alleges that once he pled guilty, Trant and Cunningham "started taking the other Co-Defendants down like dominos, by pleading them guilty, because [he] was out of the way."

Gibson filed a civil complaint in state court alleging that Trant and Cunningham's misconduct constituted legal malpractice. He also raised allegations of gross negligence, outrageous conduct, and fraud, based on the same conduct. In 1993, Trant and Cunningham moved to dismiss this complaint, a motion the court denied a year later.

Gibson also attempted to have his plea vacated on the ground that it was involuntary, by filing a motion for habeas corpus relief in federal district court pursuant to 28 U.S.C. § 2255.[1] The district court denied his motion, thereby holding that his plea was voluntary. In 1995, the parties filed an agreed order in the state trial court indicating that Gibson's habeas petition had been denied but that he intended to appeal to the United States Court of Appeals for the Sixth Circuit. Significantly, the agreed order stated that "the relief sought under [the habeas statute] is for the same action complained of in the instant case, and the parties agree that it will be to everyone's advantage to take this case off the trial docket until after the said appeal is over." The order provided that

---

[1]The parties refer to this as a "post-conviction proceeding," which it is, although in federal practice it is called a habeas proceeding. Of course, since the drug conviction was in the federal system, there were no state post-conviction proceedings under the Tennessee Post-Conviction Procedure Act, Tenn. Code Ann. §§ 40-30-201 et seq. (1997 Repl.). Nevertheless, it is worth emphasizing that our holding today applies to both federal and state post-conviction proceedings, for, as is clear from our discussion of the exoneration requirement, there is no reason to distinguish between the two in this context.

Gibson's legal malpractice case would not be put back on the jury trial docket until his Sixth Circuit appeal was decided, unless either party moved for an earlier court date.

The Sixth Circuit affirmed the district court's denial of habeas relief. Gibson did not seek review in the United States Supreme Court. Trant and Cunningham then filed a second motion to dismiss in state court. Pursuant to Rule 12.02(6) of the Tennessee Rules of Civil Procedure, they asserted that Gibson's complaint failed to state a claim upon which relief could be granted because he "suffered no damages as a proximate result of the alleged breach of the Defendant's duty of representation . . . ." The defendants aver that since the Sixth Circuit affirmed the district court's denial of post-conviction (in this case, habeas) relief, the federal courts have already determined that Gibson's guilty plea was valid; Gibson cannot now recover damages based on the claim that his plea was invalid.

The state court granted Trant and Cunningham's motion to dismiss. In its order, the court stated: "This Court has determined that in light of the Federal Courts' holding that Mr. Gibson's plea of guilty was, in fact, voluntary, and there exists no right or recovery in this action in this court, mandating dismissal of this case." In making this determination, the court recognized that its knowledge of what occurred in the federal habeas proceedings was limited, for the documents in that case were placed under seal. The record does not reveal the reason for the seal, but at oral argument before this Court Gibson's counsel suggested that Gibson himself moved to have the record sealed. Whatever the reason for the seal, the record of the federal proceedings is limited to an oral stipulation the parties made during the hearing on the second motion to dismiss. That stipulation, which was included in the trial court's order, states as follows:

In the United States District Court For The Eastern District of Tennessee, the plaintiff entered a plea of guilty to a single count of engaging in a continuing criminal enterprise in violation of 21 U.S.C. § 848. After the trial Court's acceptance of the plaintiff's plea and the imposition of sentence, a "Motion under 28 U.S.C. § 2255 to Vacate, Set Aside, or Correct [a] Sentence by a Person in Federal Custody" was filed. The Federal Court placed that file under "SEAL" and it remains sealed to this day.

The § 2255 motion allegedly [sic] breach of plaintiff's Plea Agreement by the United States, that his plea of guilty was involuntary, that the defendants encountered an actual conflict of interest in representing Mr. Gibson but nevertheless contained [sic] multiple representation of him and his six (6) co-defendants and that the defendants, Cunningham and Trant, were ineffective in representing the defendant in connection with the foregoing. The trial court denied the plaintiff's request for relief and dismissed his action after an evidentiary hearing. The case was appealed to the United States Sixth Circuit Court of Appeal which affirmed the trial court. No application for a Writ of Certiorari to the Supreme Court was filed and the time limitation for doing so has long expired.

Gibson appealed to the Court of Appeals, which affirmed the trial court. The Court of Appeals, after surveying the case law from other jurisdictions, reasoned as follows:

> [T]he anomaly of allowing this suit to go forward is obvious. The voluntary plea of guilty to a criminal charge was the proximate cause of any injury or loss suffered as a result of the conviction, and the appellant must obtain post-conviction relief as a condition precedent to the maintenance of this action. The majority rule is clear: a guilty person is not entitled to civil damages for being found guilty notwithstanding his/her lawyers' negligence. We agree with the argument of the appellees that the allowance of this action would shock the public conscience, engender disrespect for the judicial system and generally discredit the concept of justice.

Gibson filed an application in this Court seeking review of the Court of Appeals' judgment. We granted permission to appeal and now affirm that court's decision. Specifically, we hold that a plaintiff must obtain post-conviction relief in order to maintain a legal malpractice claim against his defense lawyers. Because Gibson cannot meet this standard, the courts below correctly ruled that Trant and Cunningham are entitled to summary judgment.

## **Analysis**

Appellate review of this question of law is de novo, without a presumption of correctness of the Court of Appeals' judgment. See Nelson v. Wal-Mart Stores, Inc., 8 S.W.3d 625, 628 (Tenn. 1999); Owens v. Truckstops of America, 915 S.W.2d 420, 424 (Tenn. 1996).

Although the issue before us first came to the trial court on Trant's and Cunningham's motion to dismiss, Tenn. R. Civ. P. 12.02(6), the parties and the court considered matters outside the pleadings, namely, the stipulation quoted above. Therefore, the Court of Appeals properly treated the motion as one for summary judgment. See Tenn. R. Civ. P. 12.03 ("If, on a motion for judgment on the pleadings, matters outside the pleadings are presented to and not excluded by the court, the motion shall be treated as one for summary judgment and disposed of as provided in Rule 56 . . . .").

Rule 56.04 provides that summary judgment is appropriate where: (1) there is no genuine issue with regard to the material facts relevant to the claim or defense contained in the motion, and (2) the moving party is entitled to judgment as a matter of law on the undisputed facts. See Staples v. CBL & Associates, Inc., 15 S.W.3d 83, 88 (Tenn. 2000); Bain v. Wells, 936 S.W.2d 618, 622 (Tenn. 1997). "Courts must view the evidence in the light most favorable to the nonmoving party and must also draw all reasonable inferences in the nonmoving party's favor." Staples, 15 S.W.3d at 89. "Courts should grant a summary judgment only when both the facts and the inferences to be draw from the facts permit a reasonable person to reach only one conclusion." Id.

The specific issue before us is one of first impression for our Court. The closest precedent is Sanjines v. Ortwein & Assocs., 984 S.W.2d 907 (Tenn. 1998), which addressed the issue of whether a plaintiff who files a malpractice claim against his defense lawyer has a right to a stay of

that claim until all his post-conviction proceedings are complete. We held that he does not. Id. at 911; see Logan v. Winstead, 23 S.W.3d 297, 302 (Tenn. 2000) ("While the Sanjines case dealt with a plaintiff's filing of simultaneous civil and post-conviction actions, its language makes clear that incarcerated plaintiffs do not have a constitutional right to a stay of their civil proceedings."). We further held that it is "within the trial court's discretion to determine, on a case-by-case basis, how to effectively move both cases through the system at the same time." Sanjines, 984 S.W.2d at 911. The rationale of this holding, in part, was that a trial court should have the discretion to dismiss frivolous cases on the pleadings, or on summary judgment motions, rather than having to keep such claims on the docket for years, to the detriment of the defense attorney who may well have done an exemplary job representing the client.

Today we are faced with a case where the trial court decided not to dismiss the malpractice case at the outset. The court instead waited until the post-conviction proceedings were complete, and then, considering the outcome of those proceedings, dismissed the case. The question presented is whether, as the Court of Appeals held, the trial court's reason for dismissing the case was proper, namely, that a plaintiff cannot maintain a malpractice claim against his criminal defense lawyer unless he first prevails in his post-conviction proceeding.

We begin our analysis by listing the elements of a malpractice claim. In order to make out a prima facie legal malpractice claim, the plaintiff must show (1) that the accused attorney owed a duty to the plaintiff, (2) that the attorney breached that duty, (3) that the plaintiff suffered damages, (4) that the breach was the cause in fact of the plaintiff's damages, and (5) that the attorney's negligence was the proximate, or legal, cause of the plaintiff's damages. See Lazy Seven Coal Sales, Inc. v. Stone & Hinds, 813 S.W.2d 400, 403 (Tenn. 1991); Horton v. Hughes, 971 S.W.2d 957, 959 (Tenn. Ct. App. 1998). As with any tort claim, the plaintiff has the burden of proving each of these elements. One way of framing the question presented in this case is whether the tort of legal malpractice requires any additional elements if the plaintiff is a criminal defendant who is suing the lawyer who represented him in the criminal case. Specifically, must a plaintiff prove – in addition to the five basic elements – that he obtained relief in a final post-conviction judgment? For a number of compelling reasons, we hold that a plaintiff in what courts often call a "criminal malpractice" action must prove this additional element.

The large majority of courts to address this issue have held that some form of exoneration is a precondition to maintaining a criminal malpractice claim. A plaintiff must meet this exoneration requirement before he can sue his defense lawyer.

Some courts hold that a plaintiff must be exonerated through post-conviction relief. See Shaw v. State, 816 P.2d 1358, 1360 (Alaska 1991) (Shaw I); Steele v. Kehoe, 747 So.2d 931, 933 (Fla. 1999); Levine v. Kling, 123 F.3d 580, 583 (7th Cir. 1997) (applying Illinois law); Berringer v. Steele, 758 A.2d 574, 597 (Md. Ct. Spec. App. 2000); Morgano v. Smith, 879 P.2d 735, 737 (Nev. 1994); Stevens v. Bispham, 851 P.2d 556, 566 (Or. 1993); Bailey v. Tucker, 621 A.2d 108, 115 (Pa. 1993); Peeler v. Hughes & Luce, 909 S.W.2d 494, 497-98 (Tex. 1995); Adkins v. Dixon, 482 S.E.2d 797, 801 (Va. 1997). Cf. Heck v. Humphrey, 512 U.S. 477, 486-87, 114 S. Ct. 2364, 2373, 129 L.

Ed. 2d. 383 (1994) ("We hold that, in order to recover damages for allegedly unconstitutional conviction or imprisonment, or for other harm caused by actions whose unlawfulness would render a conviction or sentence invalid, a § 1983 plaintiff must prove that the conviction or sentence has been reversed on direct appeal, expunged by executive order, declared invalid by a state tribunal authorized to make such determination, or called into question by a federal court's issuance of a writ of habeas corpus, 28 U.S.C. § 2254.").

Some courts – a number of which are also in the first category – hold that the exoneration rule requires a plaintiff to be actually innocent of the criminal conduct underlying his conviction. See Shaw v. State, 861 P.2d 566, 572 (Alaska 1993) (holding that actual innocence is relevant and that the defense lawyer may raise the issue of the plaintiff's guilt as an affirmative defense) (Shaw II); Coscia v. McKenna & Cuneo, 108 Cal. Rptr. 2d 471, 475-76 (Cal. 2001); Wiley v. County of San Diego, 966 P.2d 983, 991 (Cal. 1998); Gomez v. Peters, 470 S.E.2d 692, 695 (Ga. Ct. App. 1996); Levine, 123 F.3d at 582; Ray v. Stone, 952 S.W.2d 220, 224 (Ky. Ct. App. 1997); Glenn v. Aiken, 569 N.E.2d 783, 788 (Mass. 1991) (holding that a plaintiff must prove actual innocence, but not deciding whether this is required in a case involving the defense lawyer's "clear negligence whose causal connection to the conviction is clear"); Rodriguez v. Nielsen, 609 N.W.2d 368, 374 (Neb. 2000); Morgano, 879 P.2d at 738; Carmel v. Lunney, 511 N.E.2d 1126, 1128 (N.Y. 1987); Mahoney v. Shaheen, Cappiello, Stein & Gordon, 727 A.2d 996, 998-99 (N.H. 1999); Bailey, 621 A.2d at 113; Peeler, 909 S.W.2d at 497-98; Adkins, 482 S.E.2d at 801.

Only a few courts have rejected the exoneration requirement, or implied that they would in an appropriate case. See Mylar v. Wilkinson, 435 So.2d 1237, 1239 (Ala. 1983) (confronting a plaintiff who had obtained post-conviction relief, but suggesting there is no difference between civil and criminal malpractice cases); Gebhardt v. O'Rourke, 510 N.W.2d 900, 906 (Mich. 1994); Duncan v. Campbell, 936 P.2d 863, 866-68 (N.M. Ct. App. 1997) (confronting a plaintiff who had obtained post-conviction relief, but rejecting the reasoning behind the exoneration rule); Krahn v. Kinney, 538 N.E.2d 1058, 1061 (Ohio 1989). See also Jepson v. Stubbs, 555 S.W.2d 307, 313-14 (Mo. 1977) (confronting a plaintiff who had obtained post-conviction relief, but stating directly that there is no difference between civil and criminal malpractice cases). But see State ex rel. O'Blennis v. Adolf, 691 S.W.2d 498, 504 (Mo. Ct. App. 1985) (relying on collateral estoppel and public policy arguments consistent with the exoneration requirement).

Courts rejecting the exoneration requirement essentially reason that a criminal defense lawyer's wrong advice can cause her client harm, just as a civil lawyer's advice can; since a plaintiff in a criminal malpractice case may be able to meet his burden of proof, no justification exists for a bright-line exoneration rule denying recovery; each case should be given a full hearing, and only frivolous cases should be dismissed. See, e.g., Gebhardt, 510 N.W.2d at 906; Krahn, 538 N.E.2d at 1061. Moreover, since criminal defense lawyers can indeed harm clients, to impose barriers against tort recovery on the ground that civil malpractice and criminal malpractice cases are different in some respects, is to enshrine "legal fictions" into the law. See, e.g., Duncan, 936. P.2d at 867-68. Perhaps the most forceful articulation and analysis of the minority view can be found in the concurring opinion in Stevens:

I believe that plaintiff and other persons convicted of a crime will be astonished to learn that, even if their lawyer's negligence resulted in their being wrongly convicted and imprisoned, they were not harmed when they were wrongly convicted and imprisoned but, rather, that they are harmed only if and when they are exonerated. Such persons will be no less astonished because of the majority's insistence that its rule is simply a legal definition of harm (i.e., a legal fiction). Such attempts to divorce the law from reality should be avoided.

Stevens, 851 P.2d at 566 (Unis, J., concurring).

As we explain below, this reasoning is flawed. It fails to adequately account for: equitable principles; the difficulties of proving causation and damages in a criminal malpractice case, where the plaintiff has not yet been exonerated; the existence of comprehensive post-conviction review, which obviously has no counterpart in civil law; collateral estoppel; and the need to encourage the thorough representation of indigent criminal defendants. But the reasoning fails on perhaps an even more fundamental level. The minority of courts that reject the exoneration requirement, in effect, hold that someone unquestionably guilty of a crime (even the most serious of violent crimes), whose conviction is upheld, may nevertheless sue his defense lawyer and recover damages for the time he spent in jail.

The soundness of this result is open to serious doubt; indeed, it may well be indefensible. This is not simply because of the ethical maxim that a criminal should not profit from his wrongdoing, see Hicks v. Boshears, 846 S.W.2d 812, 814 (Tenn. 1993); Adkins, 482 S.E.2d at 802, or that convicts should not be allowed to recover from their defense counsel, thereby shifting responsibility away from their crime, see, e.g., Shaw, 861 P.2d at 571; Mahoney, 727 A.2d at 999; Peeler, 909 S.W.2d at 498, or, as the Court of Appeals below thought, because it would "shock the public conscience, engender disrespect for courts and generally discredit the administration of justice," State ex rel. O'Blennis, 691 S.W.2d at 504 (quotation omitted). Apart from these ethical concerns, there is a serious analytical flaw in the minority rule. As the court in Levine stated (after noting that a plaintiff must prove he would have been acquitted in order to establish causation):

[B]ecause of the heavy burden of proof in a criminal case, an acquittal doesn't mean that the defendant did not commit the crime for which he was tried; all it means is that the government was not able to prove beyond a reasonable doubt that he committed it. On [the plaintiff's] view there would be cases in which a defendant guilty in fact of the crime with which he had been charged, and duly convicted and imprisoned (perhaps after a retrial in which he was represented by competent counsel), would nevertheless obtain substantial damages to compensate him for the loss of his liberty during the period of his rightful imprisonment.

Not only would this be a paradoxical result, depreciating and in some cases wholly offsetting the plaintiff's criminal punishment, but it would be contrary to fundamental principles of both tort and criminal law. Tort law provides damages

only for harms to the plaintiff's legally protected interests, Restatement (Second) of Torts, § 1 comment d, § 7(1) (1965), and the liberty of a guilty criminal is not one of them. The guilty criminal may be able to obtain an acquittal if he is skillfully represented, but he has no right to that result (just as he has no *right* to have the jury nullify the law, though juries sometimes do that), and the law provides no relief if the "right" is denied him.

Levine, 123 F.3d at 582. The California Supreme Court recently found this analysis persuasive, Wiley, 966 P.2d at 990, and so do we.

For this fundamental reason alone we reject the minority rule. The question becomes, therefore, which form of the exoneration rule do we adopt. Because of the procedural posture of this case, we need not address whether a plaintiff must prove actual innocence. Gibson, as discussed, has already attempted to vacate his guilty plea as being involuntary, and the federal courts have rejected his arguments. Thus, he has not been exonerated through post-conviction relief, which means that he is deemed guilty of violating federal drug laws.

There are several reasons supporting the exoneration rule in general, and the requirement that plaintiffs first obtain post-conviction relief in particular. Among the most persuasive reasons, which several courts have relied on, is the perplexing problem of how a criminal defendant could ever prove that his lawyer caused him any legally cognizable injury, and the related problem of how he could prove damages. These are requirements of any tort action, including legal malpractice. See Lazy Seven Coal Sales, Inc., 813 S.W.2d at 403. The issue may be framed with reference to Gibson's case. He claims that were it not for the defendants' statements about the prosecutor's intent to file charges against his father, or their statements concerning his possible maximum sentence, he would not have been injured. But for these statements, Gibson claims, he would have rejected the plea bargain and gone to trial. Yet this argument is insufficient. Gibson must also prove that, at trial, he would have been acquitted, or, if found guilty, he would have received a sentence less than what he did receive, which was twenty years. We do not see how he could possibly meet this burden.

Nevertheless, if the difficulties of proving causation were simply due to the unique nature of Gibson's case, it would not be appropriate to adopt a bright-line rule, as we do today. But these difficulties arise in virtually every criminal malpractice case. The reason, in part, has to do with the standard of proof in criminal cases, as opposed to civil cases, namely, the state must prove the defendant's guilt beyond a reasonable doubt. As one court has stated, the plaintiff "must prove by a preponderance of the evidence that, but for the negligence of his attorney, the jury could not have found him guilty beyond a reasonable doubt." Shaw II, 861 P.2d at 573. In most, if not the overwhelming majority of cases, we think this standard will prove unmanageable. See Wiley, 966 P.2d at 990; Glenn, 569 N.E.2d at 787-88.

The dilemma of proving causation is not simply a matter of the complexity of the task facing jurors. Rather, it highlights a basic, theoretical distinction between civil and criminal malpractice

actions that, in terms of the causation requirement, strongly supports treating these cases differently. The California Supreme Court discussed the issue as follows:

> In a civil malpractice action, the focus is solely on the defendant attorney's alleged error or omission; the plaintiff's conduct is irrelevant. In the criminal malpractice context by contrast, a defendant's own criminal act remains the ultimate source of this predicament irrespective of counsel's subsequent negligence. Any harm suffered is not "only because of" attorney error but principally due to the client's antecedent criminality.

Wiley, 966 P.2d 983, 988; see also Berringer, 758 A.2d at 597 ("If a potential criminal plaintiff is unsuccessful in obtaining relief from conviction, then it would seem that the attorney's conduct was not the proximate cause of the conviction or injury."); Rodriguez, 609 N.W.2d at 373; Peeler, 909 S.W.2d at 497. Therefore, the Court in Wiley concluded, "it is not at all difficult to defend a different rule because criminal prosecution takes place in a significantly different procedural context, 'and as a result the elements to sustain a cause of action must likewise differ.'" Wiley, 966 P.2d 983, 988 (quoting Bailey, 621 A.2d at 114).

Simply put, criminal malpractice actions arise out of criminal convictions, and the validity of criminal convictions are not designed to be tested in the civil tort arena. They are not so designed for two reasons. First, depending on the relief sought, civil damage remedies, if awarded, may necessarily imply that the criminal courts reviewing the conviction erred. See Heck, 512 U.S. at 486, 114 S. Ct. at 2371 (invoking the "hoary principle that civil tort actions are not appropriate vehicles for challenging the validity of outstanding criminal judgments"); Clay v. Allen, 242 F.3d 679, 682 (5th Cir. 2001) (discussing this principle, in a Heck analysis); Olsen v. Correiro, 189 F.3d 52, 68-69 (1st Cir. 1999) (same). Gibson's suit, if allowed to proceed, would violate this principle. The federal courts have already determined that his plea was voluntary. This finding necessarily encompasses the rejection of Gibson's allegations against Trant and Cunningham: if the evidence showed that he pled guilty not because he was guilty but because of threats (those of the prosecutor, as relayed to him by his lawyers) and misrepresentations (the gross miscalculation of his possible maximum sentence), we must presume that the federal courts would have granted him relief. For the jury to allow Gibson to recover damages, however, would require it to find that these same allegations are, in fact, true. This would be in direct contradiction to the federal courts' judgments. We should not allow a tort suit to undermine the post-conviction process by overruling its judgments.[2]

---

[2]This rationale of our holding today rests on the principle that legal malpractice claims should not be allowed if they call into question previously decided post-conviction judgments – a principle that applies to both state and federal judgments. We therefore do not address the issue of whether federal common law would prohibit us from allowing a lawsuit to proceed in state court that, in effect, implied the invalidity of a federal judgment. See Semtek Int'l Inc. v. Lockheed Martin Corp., 531 U.S. 497, 121 S. Ct. 1021, 1027-28, 149 L. Ed. 2d 32 (2001). Neither the parties nor the courts below addressed this issue, but it is a serious one, with constitutional implications.

The second reason is that the "criminal justice system itself provides adequate redress for any error or omission," and the many safeguards in the system – the requirement of proof beyond a reasonable doubt, the exclusionary rule, the right to counsel, etc. – are designed to ensure that allegations such as Gibson's do not go unremedied. Wiley, 966 P.2d at 988-89; see also Mahoney, 727 A.2d at 999; Stevens, 851 P.2d at 561; Bailey, 621 A.2d at 114. The post-conviction process is an essential part of this system, providing another level of court review after the defendant's direct appeals. The purpose of post-conviction, after all, is to prevent the wrongly accused and unjustly convicted from suffering undeserved criminal penalties, and to enforce the constitutional guarantees of a fair trial. Tort law cannot possibly serve these ends. It is therefore reasonable and fair to require criminal defendants to look to the legal process designed to provide redress for wrongful convictions, and then to respect the outcome of that process once it has concluded. As one court has concisely stated, "it is the public policy of this state to treat any person who has been convicted of any criminal offense as validly convicted unless and until the person's conviction has been reversed . . . ." Stevens, 851 P.2d at 561.

Another reason that courts have prevented criminal malpractice actions from proceeding absent post-conviction relief is the doctrine of collateral estoppel (also called "issue preclusion"). "Once an issue has been actually or necessarily determined by a court of competent jurisdiction, the doctrine of collateral estoppel renders that determination conclusive on the parties and their privies in subsequent litigation, even when the claims or causes of action are different." State ex rel. Cihlar v. Crawford, 39 S.W.3d 172, 178-79 (Tenn. Ct. App. 2000); see Massengill v. Scott, 738 S.W.2d 629, 631 (Tenn. 1987); Blue Diamond Coal Co. v. Holland-America Ins. Co., 671 S.W.2d 829, 832 (Tenn. 1984); Beaty v. McGraw, 15 S.W.3d 819, 824 (Tenn. Ct. App. 1998). The doctrine promotes finality, conserves judicial resources, and prevents inconsistent decisions. See State ex rel. Cihlar, 39 S.W.3d at 178; Beaty, 15 S.W.3d at 824. It applies to issues of law and to issues of fact. State ex rel. Cihlar, 39 S.W.3d at 179 (citing Restatement (Second) of Judgments § 27 (1982)).

We have never before considered the preclusive effect of a post-conviction court's finding that a guilty plea was entered into voluntarily. Nor have we found any precedent in Tennessee that offers guidance on the application of collateral estoppel in the context of a criminal malpractice case, especially where the later civil suit is based on the exact same allegations made in the post-conviction proceedings.[3] There can be no dispute that this is an accurate description of the factual

---

[3] In support of his argument that collateral estoppel should not apply, Gibson cites Office of Disciplinary Counsel v. McKinney, 668 S.W.2d 293 (Tenn. 1984), where we held that post-conviction court opinions granting relief to criminal defendants could not be used as evidence in later Board of Professional Responsibility disciplinary actions against their defense lawyers. McKinney, however, is inapposite; indeed, attorney disciplinary matters are very different than tort suits. Our principal concern in McKinney was that the attorney never had the opportunity in a previous preceding to litigate the issue of whether his representation amounted to misconduct. As we stated, "McKinney is entitled to his 'day in court' on the allegations of professional misconduct, and the opportunity to answer the charges leveled against him by the Board of Professional Responsibility." Id. at 296-97. Gibson, of course, has already had his day in court.

Gibson also cites a Court of Appeals' decision, Grange Mutual Casualty Co. v. Walker, 652 S.W.2d 908, 910

(continued...)

and procedural background of Gibson's case. His malpractice case against Trant and Cunningham seeks recovery on the theory that they induced him to plead guilty involuntarily. Specifically, he alleges they told him that the federal prosecutor would file charges against his father if he did not accept the plea and that he would only receive eight to ten years if he pled guilty (though the minimum sentence was twenty years). Yet Gibson has already made these allegations before the federal courts. Moreover, as he was facing a twenty-year jail term, he had *every incentive* to prove these allegations and to raise other allegations relating to his claim that he pled guilty based on his lawyers' willfully erroneous advice. In finding that his guilty plea was voluntary, those courts necessarily considered and rejected these allegations. Under these circumstances, their judgments should be given preclusive effect.[4]

This conclusion was strongly stated by Professor Geoffrey C. Hazard, a well-known scholar of civil procedure:

> The clearest case for such an estoppel is where a defendant pleads guilty to a substantial criminal charge and then seeks in civil litigation concerning the same transaction to assert that he did not commit the criminal act. Particularly galling is the situation where a criminal convicted on his own guilty plea seeks as plaintiff in a subsequent civil action to claim redress based on a repudiation of the confession. The effrontery or, as some might say it, *chutzpah*, is too much to take. There certainly should be an estoppel in such a case.

Ray, 952 S.W.2d at 224 (a Kentucky Court of Appeals case) (quoting Hazard, Revisiting the Second Restatement of Judgements; Issue Preclusion and Related Problems, 66 Cornell. L. Rev. 564, 578

---

[3](...continued) (Tenn. Ct. App. 1983). In Grange, the defendant pled guilty to voluntary manslaughter. The plaintiff/insurance company sought a declaration that the defendant was not entitled to benefits relating to damages he suffered during the killing. The court declined to apply collateral estoppel, stating that a guilty plea is generally not conclusive on an issue in a subsequent civil action. Among other differences between Grange and the case at bar, we note that Grange involved "offensive" collateral estoppel (where the plaintiff attempts to prevent the defendant from relitigating an issue), which has always been viewed less favorably than "defensive" collateral estoppel (as in Gibson's case). See, e.g., Beaty, 15 S.W.3d at 824-25.

[4]Indeed, as stated in footnote two of this opinion, it may be that the state courts *must* apply federal collateral estoppel law, since the issue at the heart of the preclusion inquiry has been determined by the federal courts. We do not decide this issue, except to note that Semtek, and the cases discussed therein, strongly suggest that federal law controls. See Semtek, 121 S. Ct. at 1027-28 ("*[W]hether a Federal judgment has been given due force and effect in the state court is a Federal question reviewable by this court*, which will determine for itself whether such judgment has been given due weight or otherwise.") (quoting Deposit Bank v. Frankfort, 191 U.S. 499, 514, 24 S. Ct. 154, 48 L. Ed. 276 (1903) (emphasis added)). Moreover, it appears likely that federal courts would apply collateral estoppel here. See Levine, 123 F.3d at 583 ("If [the plaintiff's] postconviction attacks on the conviction fail, then he cannot bring a malpractice suit even if he is prepared to present evidence that he was innocent in fact, and his conviction was therefore unjust. For by operation of the doctrine of collateral estoppel, a valid criminal conviction acts as a bar to overturning that conviction in a civil damages suit."); see generally Burlington Northern R.R. Co. v. Hyundai Merch. Marine Co., 63 F.3d 1227, 1231-33 (3rd Cir. 1995) (discussing issue preclusion).

(1981)). Numerous other courts have applied this reasoning to hold that the failure to obtain post-conviction relief precludes a criminal malpractice claim concerning the same issues. See Shaw I, 816 P.2d at 1361 ("The requirement of post-conviction relief promotes judicial economy because many issues litigated in the quest for post-conviction relief will be duplicated in the legal malpractice claim."); Sanders v. Malik, 711 A.2d 32, 33-34 (Del. 1998); Levine, 123 F.3d at 583 ("[B]y operation of the doctrine of collateral estoppel, a valid criminal conviction acts as a bar to overturning that conviction in a civil damages suit."); Brewer v. Hagemann, 771 A.2d 1030, 1033 (Me. 2001) ("When the malpractice plaintiff has every incentive in his post-conviction petition to fully litigate the issue of whether his attorney's malfeasance caused him any prejudice, collateral estoppel is appropriate."); Schlumm v. O'Hagan, 433 N.W.2d 839, 845 (Mich. Ct. App. 1989) ("The judicial system made a full and fair determination that plaintiff received effective assistance of counsel through the plea-taking stage. Plaintiff had the opportunity to fully present his case at his motion for new trial."); State ex rel. O'Blennis, 691 S.W.2d at 503 ("In this case involving defensive invocation of collateral estoppel [the plaintiff's] guilty plea precludes him from denying his guilt of the assault charge. That plea decided the same issue of fact present in his malpractice case; it resulted in a judgment on the merits; [the plaintiff] is a party to both cases; he had a full and fair opportunity to litigate his guilt or innocence."); Carmel v. Lunney, 119 A.D.2d 50, 53 (N.Y. App. Div. 1986); Stevens, 851 P.2d at 562 ("[T]o allow a person convicted of a criminal offense to sue that person's lawyer without having first overturned the conviction would mean that the courts would be permitting relitigation of a matter that is supposed to be settled . . . ."). It is true that not all courts readily apply collateral estoppel in these circumstances. See Gomez, 470 S.E.2d at 695; Krahn, 538 N.E.2d at 1063. But we think that the better rule is to recognize that criminal defendants who seek to overturn their convictions, as they have every incentive to do, may not relitigate their claims in a malpractice suit. Preventing such an outcome is the purpose of the collateral estoppel doctrine.

As we have already explained, a criminal defendant who believes he has been wrongly convicted should seek redress through the post-conviction process, not through a legal malpractice action. Collateral estoppel provides that once he does seek such relief, and it is denied, he cannot thereafter bring a civil claim based on the same allegations brought before the post-conviction court. It seems to us that the first conclusion leads ineluctably to the second. If the criminal courts are the mechanisms our society relies upon to provide relief to wrongly-convicted defendants, it should not be that civil courts may ignore the results of the post-conviction process once it has concluded.

There is one more compelling reason in support of the post-conviction exoneration rule we adopt today: encouraging the thorough representation of criminal defendants. We say "thorough" because a rule allowing criminal defendants to sue their defense lawyers may result in the practice of "defensive" law, in which lawyers spend time and energy attempting to "insulate their trial court decisions" from attack in a later malpractice case. Wiley, 966 P.2d at 991. For example, as one court has noted, "an attorney who believes, based on his professional experience, that a witness suggested by the defendant will do more harm than good might nonetheless accede to the defendant's desire to have that witness testify rather than exercise his legal judgment to exclude him." Bailey, 621 A.2d at 114. "[I]n our already overburdened system it behooves no one to encourage the

additional expenditure [of] resources merely to build a record against a potential malpractice claim." Id.; Wiley, 966 P.2d at 991.

Equally important is the need to ensure the adequate supply of defense lawyers willing to represent indigent clients. As the Supreme Court of Massachusetts wrote:

> Most criminal defendants in this Commonwealth are represented by counsel appointed at public expense or private counsel whose fees are not substantial. The public has a strong interest in encouraging the representation of criminal defendants, particularly those who are ruled to be indigent. The rule we favor helps to encourage that kind of legal representation by reducing the risk that malpractice claims will be asserted and, if asserted, will be successful.

Glenn, 569 N.E.2d at 788. Other courts have emphasized this important public policy concern in adopting the exoneration rule. See Rodriguez, 609 N.W.2d at 374 ("[T]he public has a strong interest in encouraging the representation of criminal defendants, especially indigents."); Mahoney, 727 A.2d at 100 (the exoneration rule "promotes an ample defense bar by reducing the risk of malpractice claims"); Bailey, 609 N.W.2d at 114. We find this argument compelling. An obvious counter-argument is that criminal malpractice claims may deter bad lawyering. As discussed, however, when that bad lawyering results in a wrongful conviction there are post-conviction remedies available to criminal defendants. As for deterrence, the desire to win cases and prevent clients from suffering criminal penalties is sufficient incentive to do good work, at least for the large majority of lawyers. For those lawyers whose standard of representation falls short of what the Code of Professional Responsibility mandates, however, the Board of Professional Responsibility can and should bring disciplinary actions. We should not rely on legal malpractice actions to do the work of the criminal justice system and the Board of Professional Responsibility, especially where doing so may discourage the thorough representation of indigent criminal defendants.

Based on principles of equity, tort law, post-conviction law, and public policy, we hold that a criminal defendant must obtain post-conviction relief in order to maintain a legal malpractice claim against his defense lawyer. Since Gibson did not prevail in his post-conviction proceeding, we affirm the decision of the Court of Appeals, which affirmed the trial court's grant of summary judgment in favor of Trant and Cunningham.

We must now address Gibson's argument that, irrespective of our finding that the federal court fully considered the voluntariness of his plea, other causes of action remain viable. Specifically, he is suing Trant and Cunningham for gross negligence, outrageous conduct, and fraud, in addition to legal malpractice. He argues that since the record of the federal court proceedings is sealed, and the evidence of what occurred in those courts is limited to a narrow stipulation, we have no basis for dismissing these other claims. We disagree.

Initially, we note that Gibson's lawyer at oral argument suggested that Gibson himself moved to have the federal record sealed. If true, he is judicially estopped from arguing that he is now prejudiced as a result of the seal. But there is a more important reason for rejecting Gibson's

argument. A close reading of his complaint reveals that none of these allegations involve any facts apart from those underlying his malpractice claim, namely, the circumstances surrounding the alleged involuntariness of his plea. It is apparent that Gibson is suing Trant and Cunningham on these other causes of action *precisely* because they allegedly gave him incorrect advice about his sentence, and that, due to a conflict of interest, they employed unethical conduct and false pretenses (e.g., the prosecutor's threat to file charges against his father) to force him to plead guilty. There are no other allegations. Moreover, the parties stipulated in an agreed order that the federal habeas court considered the same issues underlying Gibson's malpractice claim; indeed, that is why the trial court stayed the claim until the outcome of the post-conviction process.

We therefore find that all of Gibson's allegations can be reduced to the charge that he suffered damage because his lawyers induced him to plead guilty involuntarily. As we have explained, the federal courts have considered and rejected this charge. Gibson is not entitled to relitigate these claims in the guise of a malpractice suit.

A final issue relates to how our holding affects the statute of limitations for bringing malpractice claims, which is one year from the time the cause of action accrues. Tenn. Code Ann. § 28-3-104(a)(2). "When the cause of action accrues is determined by applying the discovery rule." John Kohl & Co. v. Dearborn & Ewing, 977 S.W.2d 528, 532 (Tenn. 1998). "Under this rule, a cause of action accrues when the plaintiff knows or in the exercise of reasonable care and diligence should know that an injury has been sustained as a result of wrongful or tortious conduct by the defendant." Id.; see also Fahrner v. SW Mfg. Inc. 48 S.W.3d 141, 143 (Tenn. 2001); Shadrick v. Coker, 963 S.W.2d 726, 733-34 (Tenn. 1998). Since we hold today that a criminal defendant must first obtain post-conviction relief, for that is an element of his criminal malpractice claim, the question arises whether he could have "discovered" his action prior to the post-conviction court's ruling.

The answer to this question must be in the affirmative. Otherwise, a criminal defendant could wait for years before filing his malpractice claim, depending on how long it took to commence and decide the post-conviction case. This would undermine the purposes behind both the discovery rule and the one-year statute of limitations. See Coscia, 108 Cal. Rptr. 2d at 483. A defendant should not have to wait years before knowing whether he will be sued, when the plaintiff already knows the facts supporting his legal claim. Indeed, we have recently decided that if a plaintiff files his malpractice claim before the post-conviction proceedings have concluded, a trial court has the discretion whether to allow that claim to proceed. See Sanjines, 984 S.W.2d at 911. As noted above, the clear implication of Sanjines is that a court can – and should – dismiss a frivolous malpractice claim. This is necessary as a matter of fairness to the defendant. It is true, however, that if the trial court decides that the plaintiff's claim should not be dismissed on the pleadings, or on summary judgment, the court must await the outcome of the post-conviction proceeding before deciding whether the case should go to a jury. Depending on the case, this could take several years, which means that for the criminal malpractice case whose merits appear weak but not frivolous, a defense lawyer may have to experience significant delay before the court finds in his favor. We see no way around this difficulty. Nevertheless, we think that defense lawyers will not frequently suffer

from this outcome, thereby causing the negative public policy consequences discussed above. Our holding today promotes the outcome that the only plaintiffs in a criminal malpractice case who will recover are those who truly deserve to win.

## **Conclusion**

For the reasons discussed above, we hold that a plaintiff cannot prevail in a "criminal malpractice" case against his defense lawyer unless he proves that he has obtained post-conviction relief. The decision of the Court of Appeals is affirmed.

_____
FRANK F. DROWOTA, III, CHIEF JUSTICE