# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT KNOXVILLE
### September 26, 2007 Session

## STATE OF TENNESSEE v. JOEY DEWAYNE THOMPSON

### Appeal from the Criminal Court for Knox County
### No. 73384    Ray L. Jenkins, Judge

---

### No. E2006-02093-CCA-R3-CD - Filed February 21, 2008

---

The defendant, Joey Dewayne Thompson, appeals from his Knox County Criminal Court jury convictions of second degree murder and voluntary manslaughter. The trial court imposed an effective sentence of 25 years to be served in the Department of Correction. On appeal, the defendant claims that the conviction of second degree murder is unsupported by sufficient evidence, that the verdicts are contradictory, that the prosecution for and conviction of second degree murder violated principles of double jeopardy, and that the prosecution was barred by principles of collateral estoppel. Following our review, we affirm the convictions.

**Tenn. R. App. P. 3; Judgment of the Criminal Court Affirmed**

JAMES CURWOOD WITT, JR., J., delivered the opinion of the court, in which JOSEPH M. TIPTON, P.J., and NORMA MCGEE OGLE, J., joined.

Bruce E. Poston, Knoxville, Tennessee, for the appellant, Joey Dewayne Thompson.

Robert E. Cooper, Jr., Attorney General and Reporter; Cameron L. Hyder, Assistant Attorney General; Randall E. Nichols, District Attorney General; and Philip Morton, Assistant District Attorney General, for the appellee, State of Tennessee.

## OPINION

The petitioner's case arises out of tragic events that occurred on June 23, 2001, near the intersection of Texas and McPherson Streets in Knoxville. The case comes to this court for the second time. The defendant was initially charged in a two-count indictment with the premeditated killing of Latoya Robinson and the attempted premeditated murder of Travis Dewayne Burgins. The State subsequently brought an additional charge: the first degree felony murder of Latoya Robinson predicated upon the attempt to commit the premeditated first degree murder of Travis Burgins. Following an April 2002 trial, the jury convicted the defendant of the lesser included offense of the second degree murder of Latoya Robinson on the premeditated murder count, convicted him of an attempt to commit the second degree murder of Travis Burgins on the attempted first degree murder

count, and was unable to reach a verdict on the first degree felony murder count. On appeal, this court reversed the convictions because the trial court erred in instructing the jury. *See State v. Joey Dewayne Thompson*, No. E2003-00569-CCA-R3-CD (Tenn. Crim. App., Knoxville, July 6, 2004).

On remand, the defendant moved to strike the felony murder count from the indictment and ultimately moved to dismiss this count, arguing that the felony murder theory was unsupported by any predicate felony in view of the jury's acquittal of the defendant of the attempt to commit the first degree murder of Burgins. The trial court rejected the defendant's bid to bar the retrial on the felony murder count.

On the eve of the second trial, the State obtained dismissal via a *nolle prosequi* of the charge of attempt to commit the second degree murder of Burgins. Following the May 2006 trial, the jury convicted the defendant of second degree murder, a lesser included offense of the count of first degree felony murder, and of voluntary manslaughter, a lesser included offense of the count of second degree murder (which itself had been charged originally as premeditated first degree murder).

With this history now in mind, we summarize the evidence presented in the May 2006 trial now under review.

The State first presented the testimony of two residents of the Texas and McPherson Streets area of Knoxville. Julian Dixon testified that he was on his porch steps at about five o'clock p.m. on June 23, 2001, when he noticed a small black car stopped on McPherson Street close to the intersection with Texas Street. A second car stopped behind this black car, and the defendant, whom Mr. Dixon had known all his life, stepped off the curb onto the street. Mr. Dixon saw the defendant carrying a pistol at his thigh as the defendant trotted toward the second car. Mr. Dixon testified "when [the defendant] got up to the passenger's window, he started shooting." Mr. Dixon neither saw nor heard talking prior to the firing of shots. He testified that seven to ten shots were fired before the car lurched off and that the defendant trotted along side it, continuing to fire. After the car left Mr. Dixon's range of view and the shooting stopped, the defendant came back into view and trotted across the street.

Ms. Shirley King testified that she lived at the corner of McPherson and Ohio Streets and was on her porch with her husband and grandchildren on June 23, 2001, when she heard about three shots being fired. She took the children into the house and called 9-1-1. Looking out her window, she saw a car coasting toward her yard. Inside the car a man pushed a girl off the steering wheel and then put the car in park to stop it. The man fell out of the car onto the ground. Ms. King went out and asked the man who shot him, and she testified that he said, "Thug shot me." She did not see a gun with the man and did not see a gun in the car. The female remained in the driver's seat and apparently died there while Ms. King awaited the arrival of an ambulance.

The State presented medical evidence that showed that Burgins had sustained four gunshot wounds to his right leg and one to his left leg. The bullets traveled from right to left, and one bullet broke the thigh bone in Burgins' left leg.

As many as five bullets entered Ms. Robinson's body, and she was killed by a shot that went through her upper right arm into her chest, breaking ribs and entering the right lung, and passing through the heart and left lung before exiting the left side of her body. A second shot entered her right forearm between her wrist and elbow, and a third bullet traveled upward from her right thigh and lodged in her lower spine. Two more bullets entered her lower right leg.

Law enforcement officers testified that nine spent .9 mm cartridges, which had all been fired from the same gun, were recovered from the street. After the car in which Burgins and victim Robinson were riding was searched at the impound lot, the officers found a .380 semi-automatic pistol under the passenger side of the front seat. They also found a magazine for this pistol lying under a compact disk case in the front seat. The officers found no discernible fingerprints on the gun or the clip. The officers also found bullet material inside the automobile and opined that the material had been fired by a .9 mm gun and not the .380.

Officer Todd Smith testified that he arrived on the scene of the shooting on June 23, 2001, and talked to the injured Burgins. He asked Burgins who had shot him, and Burgins said, "Thug." Officer Smith asked Burgins if he was referring to Joe or Joey, and Burgins said, "Yes . . . Joe, Thug." Officer Smith testified that he knew the defendant by this nickname. Officer Smith further testified that the dispersal of the .9 mm cartridges in the street were consistent with the shooter moving as he fired.

Latoya Robinson's mother testified that the victim was 18 years of age at the time of her death.

Travis Dewayne Burgins, who was called to testify by the defendant, testified that he had known the defendant all his life and had had no problems with him prior to the shooting. He testified that Latoya Robinson was his girlfriend and that she had previously dated the defendant's brother, Amos Wright. Burgins acknowledged that he had seen Wright on June 23, 2001, approximately five minutes before encountering the defendant, but Burgins claimed he had had no trouble with Wright. He testified that Ms. Robinson drove his Buick on June 23 and that he rode in the passenger seat. They turned off Texas Street into McPherson Street, and Burgins saw the defendant standing on the corner. Burgins made a peace sign, and the defendant returned the gesture. Burgins thought "everything was cool." The Buick stopped behind a car that was stopped in the street, and Burgins turned around and saw the defendant jogging toward them. He heard a click at the back of the car and saw half of a barrel sticking through the window. Burgins denied that he held a weapon or even had a weapon anywhere in the car. He testified that the defendant said nothing before opening fire. Before the shooting started, the car in front of the Buick moved away. The defendant shot 10 times, and the Buick started rolling. Burgins denied having any drugs in the car and claimed that the gun found under the seat must have been tossed into the car by someone else.

The defendant testified that he had known Burgins all his life and had had no problems with him. He testified that on June 23, 2001, while at his sister's apartment, he received a telephone call from his brother, Amos Wright, and during the call the defendant could hear

Wright's young daughter screaming in the background. The defendant testified that as a result of the call, he believed Burgins had threatened Wright with a gun. Wright was at his and the defendant's mother's house, and the defendant told him to remain there. Wright told the defendant to bring a gun. The defendant testified that he had previously acquired a .9 mm handgun but had never fired it and did not know whether it was loaded or would even work. Although he usually carried it for protection, he had placed the gun in his sister's closet when he had arrived at her apartment on June 23. After Wright called, the defendant retrieved the gun and told his sister to take her child to their mother's house. She left in her automobile. The defendant placed the gun in his pocket, changed to a longer shirt that would conceal the gun handle, and began walking to his mother's house.

The defendant testified that Burgins always carried a gun and that he had seen the gun on Burgins before. He saw Latoya Robinson drive the Buick into McPherson Street and saw Burgins in the car. When they stopped behind another car,[1] the defendant thought that he and Burgins would discuss Wright's telephone call. The defendant testified that he kept the gun in his pocket as he approached the car, but when he got up to the car, Burgins pointed a gun at him, and the defendant heard a click. He then pulled his gun and stuck it slightly in the window, telling Burgins, "[D]rop it, n-----." Burgins did not drop the gun, and the defendant began firing, aiming low so as not to kill Burgins. The defendant testified that the car remained parked and that he did not intentionally aim the gun at Latoya Robinson.

On rebuttal, the State showed that, in addition to finding the .380 pistol, officers recovered marijuana and four rocks of cocaine from the Buick after it had been moved to the impound lot.

On the second degree murder count, which originated as a charge of first degree premeditated murder and which resulted in a conviction of second degree murder in the first trial, the jury found the defendant guilty of the lesser included offense of voluntary manslaughter. On the first degree felony murder count, which resulted in no verdict in the first trial, the jury found the defendant guilty of the lesser included offense of second degree murder. The trial court sentenced the defendant to terms of 25 years and six years, respectively, on the second degree murder and voluntary manslaughter counts. The court then merged the two verdicts into a conviction of second degree murder.

### I. Sufficiency of the Evidence

In his first issue, the defendant claims that the evidence was insufficient to support his conviction of second degree murder. He argues in his brief that the evidence showed that the defendant shot Ms. Robinson in self-defense or in a heat of passion provoked by Burgins. He

---

[1]Some evidence indicated that it was the defendant's sister's black car that was stopped in the street in front of Burgins' Buick.

buttresses his arguments with claims that the physical facts, especially the presence of a gun in Burgins' car, demand a rejection of the second degree murder verdict. We disagree.

When an accused challenges the sufficiency of the evidence, an appellate court's standard of review is whether, after considering the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. Tenn. R. App. P. 13(e); *Jackson v. Virginia*, 443 U.S. 307, 324, 99 S. Ct. 2781, 2791-92 (1979); *State v. Duncan*, 698 S.W.2d 63, 67 (Tenn. 1985). This rule applies to findings of guilt based upon direct evidence, circumstantial evidence, or a combination of direct and circumstantial evidence. *State v. Winters*, 137 S.W.3d 641, 654 (Tenn. Crim. App. 2003).

Moreover, a criminal offense may be established exclusively by circumstantial evidence, *Duchac v. State*, 505 S.W.2d 237 (Tenn. 1973); *Winters*, 137 S.W.3d at 654; however, before an accused may be convicted of a criminal offense based upon circumstantial evidence alone, the facts and circumstances "must be so strong and cogent as to exclude every other reasonable hypothesis save the guilt of the defendant." *State v. Crawford*, 225 Tenn. 478, 482, 470 S.W.2d 610, 612 (1971). "In other words, '[a] web of guilt must be woven around the defendant from which he cannot escape and from which facts and circumstances the jury could draw no other reasonable inference save the guilt of the defendant beyond a reasonable doubt.'" *State v. McAfee*, 737 S.W.2d 304, 306 (Tenn. Crim. App. 1987) (quoting *Crawford*, 470 S.W.2d at 613).

Of critical importance in the present case, this court, in determining the sufficiency of the evidence, should not reweigh or reevaluate the evidence, *State v. Matthews*, 805 S.W.2d 776, 779 (Tenn. Crim. App. 1990), and questions concerning the credibility of the witnesses, the weight and value of the evidence, as well as all factual issues raised by the evidence are resolved by the trier of fact, not the appellate court, *State v. Cabbage*, 571 S.W.2d 832, 835 (Tenn. 1978). Also, this court may not substitute its inferences for those drawn by the trier of fact from the evidence. *Liakas v. State*, 199 Tenn. 298, 305, 286 S.W.2d 856, 859 (1956); *Farmer v. State*, 574 S.W.2d 49, 51 (Tenn. Crim. App. 1978). On the contrary, this court must afford the State of Tennessee the strongest legitimate view of the evidence contained in the record as well as all reasonable and legitimate inferences which may be drawn from the evidence. *Cabbage*, 571 S.W.2d at 835.

As it pertains to the present case, second degree murder is the knowing killing of another. T.C.A. § 39-13-210(a)(1) (2003).

Affording the State the strongest legitimate view of the evidence and deferring to the jury's credibility determinations and inferences drawn from the evidence, we conclude that the evidence strongly supports a conclusion that the defendant knowingly killed Ms. Robinson by firing as many as ten point-blank shots into the front seat area of a vehicle she was driving. Accordingly, we hold that the evidence was sufficient to support the conviction of second degree murder.

## II. Inconsistent or Contradictory Verdicts

The defendant claims that the second degree murder conviction should not stand because the underlying verdict is inconsistent with the jury's verdict of voluntary manslaughter.

We need not tarry long over the claim. Tennessee courts do not generally disturb verdicts because they seem to be inconsistent. *See*, *e.g.*, *Wiggins v. State*, 498 S.W.2d 92, 94 (Tenn. 1973). We see no reason to depart from the general rule and accordingly deny relief based upon the claim of inconsistent verdicts.

## III. Bar of the Felony Murder Prosecution and the Second Degree Murder Conviction

The defendant claims that a retrial on the felony murder charge was barred by principles of (1) double jeopardy and/or (2) collateral estoppel. Before analyzing these claims, we pause to schematically summarize the progression of the original three charges.

| | (1)<br>First degree premeditated murder of Ms. Robinson | (2)<br>First degree felony murder of Ms. Robinson* | (3)<br>Attempt – first degree murder of Mr. Burgins |
|---|---|---|---|
| Trial I | Second degree murder | Hung jury/mistrial | Attempt – second degree murder |
| Appeal | Reversed | | Reversed |
| Post Remand | | | *Nolle prosequi* |
| Trial II | Voluntary manslaughter | Second degree murder | |

*The charge of the felony murder of Latoya Robinson was predicated upon the homicide being committed during the attempt to perpetrate the premeditated first degree murder of Travis Dewayne Burgins.

In his brief, the defendant points to his acquittal on the charge of attempt to commit the premeditated first degree murder of Burgins and claims that, because the jury "must find [the defendant] committed the attempted first degree murder of . . . Burgins" to support a conviction of the felony murder of Latoya Robinson, the "felony murder count thus violates the double jeopardy

clause of both the United States and Tennessee Constitutions." The defendant further claims that the principles of double jeopardy and/or collateral estoppel bar the prosecution.

The state and federal constitutions protect against multiple convictions or punishments for a single offense. U.S. Const. amend. V; Tenn. Const. art. 1, § 10. Double jeopardy typically and essentially protects (1) against a second prosecution after an acquittal; (2) against a second prosecution after conviction; and (3) against multiple punishments for the same offense. *State v. Denton*, 938 S.W.2d 373, 378 (Tenn. 1996) (citations omitted). In the present case, the defendant was acquitted of attempt to commit the first degree murder of Burgins. He was not retried for this offense. We fail to see how his retrial on the charge of the first degree felony murder of Latoya Robinson implicates the first rubric of typical double jeopardy scenarios. The second scenario does not apply. Also, we see no possibility that the "multiple punishment" rubric was violated. Double jeopardy principles do not bar a defendant's convictions both of felony murder and of the predicate felony offense. *State v. Ralph*, 6 S.W.3d 251, 256 (Tenn. 1999) ("This Court has consistently held that when legislative intent is clear, a defendant may be separately convicted of two offenses which arise from one criminal transaction.") (citing *Denton*, 938 S.W.2d at 379 n. 14; *State v. Blackburn*, 694 S.W.2d 934, 936-37 (Tenn. 1985)).

To be sure, a trial proceeding that is terminated without an acquittal or conviction may bar a subsequent prosecution for the same offense. For instance, when a mistrial is declared without the consent of the accused and without the manifest necessity of a mistrial, retrial is barred by double jeopardy principles. *State v. Skelton*, 77 S.W.3d 791, 798-99 (Tenn. Crim. App. 2001). One example of "manifest necessity" long recognized as a sufficient reason for declaring a mistrial is the inability of a jury to reach a unanimous verdict. *State v. Mounce*, 859 S.W.2d 319, 322 (Tenn. 1993); *State v. Witt*, 572 S.W.2d 913, 915 (Tenn. 1978); *State v. Freeman*, 669 S.W.2d 688 (Tenn. Crim. App. 1983). However, "[i]t is only when there is no feasible and just alternative to halting the proceedings that a manifest necessity is shown." *Mounce*, 859 S.W.2d at 322 (citing *State v. Knight*, 616 S.W.2d 593, 596 (Tenn. 1981)). In the present case, the defendant has made no claim that retrial of the felony murder charge violated principles of double jeopardy on the basis that the mistrial was not manifestly necessary.

That said, consider now that the more atypical "collateral estoppel" rubric of double jeopardy bars the second degree murder conviction.

In *Massengill v. Scott*, our supreme court summarized the related doctrines of res judicata and collateral estoppel:

> "The doctrine of collateral estoppel or estoppel by judgment is an extension of the principle of res judicata, and is generally held to be applicable only when it affirmatively appears that the issue involved in the case under consideration has already been litigated in a *prior* suit between the same parties, even though based upon a different cause of action, if the determination of such issue in the former action was necessary to the judgment . . . .

> Res judicata bars a second suit between the same parties and their privies on the same cause of action as to all issues which were or could have been litigated in the former suit. Collateral estoppel operates to bar a second suit between the same parties and their privies on a different cause of action only as to issues which were actually litigated and determined *in the former suit. . . .* To sustain a plea of collateral estoppel it must be shown, inter alia, that the issue sought to be concluded not only was litigated *in the prior suit* but was necessary to the judgment in that suit."

*Massengill v. Scott*, 738 S.W.2d 629, 631-32 (Tenn. 1987) (quoting 22 Tenn. Jur. pp. 111-12) (emphasis added). "Once an issue has been actually or necessarily determined by a court of competent jurisdiction, the doctrine of collateral estoppel renders that determination conclusive on the parties and their privies in *subsequent* litigation, even when the claims or causes of action are different." *Gibson v. Trant*, 58 S.W.3d 103, 113 (Tenn. 2001) (emphasis added). As our emphases show, "[t]he doctrine of collateral estoppel . . . applies only when 'the issue involved in the case under consideration *has already been litigated in a prior suit* between the same parties . . . if the determination of such issue in the former action was necessary to the judgment." *State v. Scarbrough*, 181 S.W.3d 650, 654-55 (Tenn. 2005) (emphasis added).

Although, in Tennessee, the principle of collateral estoppel may not be used offensively against a criminal defendant, *see id.* at 658, the United States Supreme Court has upheld the use of "defensive" collateral estoppel in a criminal case. In *Ashe v. Swenson*, 397 U.S. 436, 443-47, 90 S. Ct. 1189, 1193-94 (1970), the Court said that a defendant in a criminal case may assert collateral estoppel by relying on an acquittal in a first prosecution to bar the litigation of those facts in a later prosecution for a different offense, and the Court reasoned that a defendant's reliance on the collateral estoppel doctrine in such circumstances "is embodied in the Fifth Amendment guarantee against double jeopardy." *Id.* at 445, 90 S. Ct. at 1195; *see Scarbrough*, 181 S.W.3d at 655.

The State argues in its brief that the prosecution of the defendant has yet to be concluded and that, essentially, the not-guilty verdict in the first trial on the attempt count did not occur in a *prior* proceeding. The defendant posits that the prosecution on the charge of attempt to commit the *first degree* murder of Burgins ended for all meaningful purposes when the jury returned its verdict of not guilty.

We acknowledge that the State had no right of appeal from that verdict, *see* Tenn. R. App. P. 3(c), and pursuant to double jeopardy principles, the State may not again prosecute or try the defendant for the attempt to commit the first degree murder of Burgins, *see Denton*, 938 S.W.2d at 378. Moreover, an attempt to commit second degree murder is not a qualified predicate offense for a prosecution of first degree felony murder. *See* T.C.A. § 39-13-202(a)(2) (2003) (providing that, for purposes of felony murder, first degree murder is "[a] killing of another committed in the perpetration of or attempt to perpetrate any first degree murder, act of terrorism, arson, rape, robbery,

burglary, theft, kidnapping, aggravated child abuse, aggravated child neglect or aircraft piracy."). Nevertheless, for the reasons explained below, we agree with the State.

The precise issue is one of first impression. In an endeavor to resolve the issue consistently with other, related legal doctrine, we have pondered the results of the following hypothesis: In the defendant's first trial, the jury convicts him of second degree murder on the premeditated murder count, of attempt to commit the second degree murder of Mr. Burgins, but instead of deadlocking on the first degree felony murder count, it convicts him of that charged offense. We have already explained in segment II of this opinion that contradictory jury verdicts do not compel reversal of either conviction. Thus, in our hypothesis, the verdicts would not be assailable on the ground that the felony murder predicated upon attempted first degree murder was compromised by the verdict of not guilty on the attempted first degree murder. In other words, we have not applied principles of collateral estoppel in this manner.

That said, we are unpersuaded that the resulting hypothetical effect on the felony murder charge should be different because the first trial on that count culminated in a deadlocked jury and was mistried. A mistrial does not signal the end of a prosecution; it merely prolongs the prosecution through another trial. *See Richardson v. United States*, 468 U.S. 317, 325-26, 104 S. Ct. 3081, 3086 (1984). We are unwilling to say that the mere prolonging of the prosecution for felony murder transforms it into a "subsequent" prosecution. The three counts were launched together in the stream of this prosecution, and we do not deem the acquittal on the attempt to commit first degree murder as a "prior suit" for collateral estoppel purposes. Thus, we hold that continued prosecution on the felony murder count in the second trial was not barred.

IV. Conclusion

The result in the case is that the convictions of second degree murder and voluntary manslaughter are affirmed.

_____
JAMES CURWOOD WITT, JR., JUDGE

-9-