DICKINSON, Presiding Justice,
for,the Court:
¶ 1. On April 24, 2010, Dr. James T. Peoples treated Mattie Hazel Aldridge (“Aldridge”) when she presented to St. Dominic Hospital with a recurrent deep-vein thrombosis. During her stay at the hospital, Dr. Peoples placed Aldridge on anticoagulation therapy. Almost , two months later, on June 25, 2010, after she had been transferred into the care of Trinity Mission Health & Rehabilitation of Clinton (“Trinity”), Aldridge presented to St. Dominic with a brain bleed. And two months after that, on September 24, 2010, Aldridge died. On May 13,. 2011, Tamara Glenn, Aldridge’s daughter, filed suit alleging that Dr., Peoples negligently had caused Aldridge’s death by prescribing Coumadin. Dr. Peoples filed a motion for summary judgment, which the trial court granted. Finding.no error, we affirm.
FACTUAL AND PROCEDURAL BACKGROUND
¶ 2. Dr. Peoples provided medical care for Aldridge beginning on or about April 24, 2010, after she was admitted to St. Dominic with right-leg swelling and pain— which was later diagnosed as a recurrent deep-vein thrombosis (DVT), which occurs when a blood clot (thrombus) forms in one or, more of the deep veins in the body. After conducting a risk-benefit analysis, Dr. Peoples decided to place Aldridge, on anticoagulation therapy, specifically prescribing Lovenox and Coumadin.
¶ 3. On April 30, 2010, Aldridge was discharged from St. Dominic and transferred into the care of Trinity and its medical director, Dr. Samuel Jones. At the time of her discharge; Aldridge appeared stable. She presented a subthera-peutip INR level at 1.79 and was not suffering from any internal bleeding. INR (international normalized ratio) levels indicate the length of time, it takes for blood to clot. As INR levels rise, blood thinners such as Coumadin are more risky. In his discharge orders, Dr. Peoples recommended daily INR-level testing and moni *984 toring to ensure that Aldridge’s INR levels remained within a safe range.- ■
¶ 4. After Aldridge was transferred to Trinity, Dr. Jones took over, and from that point forward was solely responsible for her medical care; He initially ordered that Aldridge continue to receive Couma-din, and that INRs be drawn. After this initial order; Dr. Jones began monitoring the INR levels and adjusting Aldridge’s intake of Coumadin accordingly.
¶ 5. On May 3, 2010, Aldridge’s INR level was suprátherapeutic at 3.6. Consequently, Dr. Jones ordered that Coumadin be withheld for a day, but that the intake be resumed at á dosage of five milligrams and that" INR levels be rechecked. On May 6, 2010, Aldridge’s INR level was still suprátherapeutic at 3.4, so Dr. Jones issued orders to withhold Coumadin for two days, then to resume with the five-milligram dose, and to recheck her INR level. On May 10, 2010, Aldridge’s INR level was within the therapeutic range at 2.3, so Dr. Jones ordered that the five-milligram dose be continued but did not order any further INR draws.
¶ 6. On May 24, 2010 — after Aldridge complained of severe swelling in her right lower leg — Dr. Jones ordered an INR draw, but the level remained therapeutic at 2.1. Following this incident, Dr. Jones failed to order any further INR draws, despite the fact that a pharmacist consultant recommended that further INR draws be conducted, and despite the fact that Dr. Jones noted his agreement with the pharmacy consultant’s recommendation.
¶ 7. On June 25, 2010 — after being out of Dr. Peoples’s care for almost two months — Aldridge presented at St. Dominic with a right hemorrhagic stroke (brain -'bleed), following which she was taken off Coumadin. Two months later, -on September 24, 2010, Aldridge died. The nonphy-sician who filled out Aldridge’s death certificate identified the cause of death as a cardiopulmonary arrest, secondary to hemorrhagic stroke (brain bleed).
¶ 8. On May 13, 2011, Glenn filed a wrongful death action against Dr. Peoples in the Circuit Court of the First Judicial District of Hinds County, alleging that Dr. Peoples had negligently prescribed Coum-adin to Aldridge and that the Coumadin had caused her death. Glenn asserted four theories of liability: (1) negligent monitoring, (2) negligent prescription of Coumadin, (3) respondeat superior, and (4) res ipsa loqwitor.
¶ 9. On December 16, 2013, Dr. Peoples filed a motion for summary judgment and, with respect to each theory of liability, argued the following: (1) he was not liable for negligent monitoring because his duty to monitor ceased once Aldridge had been transferred into the care of Trinity and Dr. Jones; (2) he was not liable on the negligent-prescription claim because any Coum-adin prescribed by him would have been out of her body by the time Aldridge experienced the brain bleed and because no evidence established that the Coumadin actually had caused Aldridge’s brain bleed; (3) he was not liable on the basis of re-spondeat superior because he did not have any authority or control'over Trinity; and (4) res ipsa loquitor did not apply because the elements of the doctrine were not met. On January 20, 2014, the trial court entered a final judgment granting Dr. Peoples’s motion and dismissing Glenn’s claims. Glenn filed a timely notice of appeal on February 11, 2014, raising-only one issue — that is, whether the trial court erred in granting summary judgment- to Dr. Peoples on the negligent-prescription and negligent-monitoring claims.
STANDARD OF REVIEW
¶ 10. When reviewing a grant or denial of a motion for summary judgment, *985 this Court employs a de novo standard of review.[1] Summary judgment should be granted only when no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law.[2] The evidence must be viewed in the light most favorable to the nonmoving party.[3] The party opposing the motion “may not rest upon the mere allegations or denials of his pleadings, but his response, by affidavits or as otherwise provided by this rule, must set forth specific facts showing that there is a genuine issue for trial.”[4]
ANALYSIS
¶ 11. To establish a prima fade case of medical negligence, the plaintiff must show that:
(1) the defendant had a duty to conform to a specific standard of conduct for the protection of others against an unreasonable risk of injury; (2) the defendant failed to conform to that required standard; (3) the defendant’s breach of duty was a proximate cause of the plaintiffs injury, and; (4) the plaintiff was injured as a result.[5]

A. Standard of Care and Breach

¶ 12. “Mississippi physicians are bound by nationally-recognized standards of care; they have a duty to employ ‘reasonable and ordinary care’ in the treatment of- then’ patients.”[6] “[O]ur law requires a plaintiff to establish — through a qualified expert — what is required of a minimally competent [physician], “whose skills and knowledge are sufficient to meet the licensure or certification requirements for the profession or specialty practiced.’ ”[7] “[Physicians] are not required to do what is generally done, or what the average [physician] would do.”[8]
¶ 13; This case does not present a “battle of the experts.” But we must draw attention to' the fact that Dr. Davey— Glenn’s designated testifying expert — is board-certified only in “wound care” and nothing else, and certainly not internal medicine.' Dr. Davey was ineligible to be board-certified in internal medicine because he had not completed the required internal-medicine residency program'. Dr. Reddix — Dr. Peoples’s designated testifying expert — is, however, board-certified in internal medicine and he devotes his medical practice solely to this area. But for purposes of this analysis, we will assume that Dr. Davey does in fact meet the necessary qualifications to testify as an “expert” regarding issues of internal medicine.
¶ 14. Both doctors articulated the same standard of care for the treatment of DVT or recurrent DVT — which was-Aldridge’s diagnosis at the time Dr; Peoples prescribed Coumadin. Specifically, the doctors agreed that the standard treatment was anticoagulation therapy — typically with Lo.venox and Coumadin — unless there were “contraindications to anticoagu- *986 lation,” or more simply put, unless medical tests indicated the risk of bleeds became too high. According to the experts, to properly.determine whether contraindications to anticoagulation exist, a treating physician should conduct a risk-benefit analysis.
¶ 15. Where the experts differed was on the issue of whether Dr. Peoples had breached the standard of care, that is, whether Dr. Peoples had acted negligently in prescribing Coumadin to Aldridge. Dr. Davey conceded that opinions can differ regarding whether the risks outweigh the benefits,- and he did, not deny that Dr. Peoples had followed the standard of care by conducting the risk-benefit analysis. Despite this, Dr. Davey maintained that the risk factors concerning Aldridge’s medical condition weighed too heavily against the possible benefits to be gained by the Coumadin, and that any opinion to the contrary was a breach of the standard of care.
¶ 16. Drs. Reddix and Peoples argued the opposite — asserting that Dr. Peoples had carefully considered all of the risk factors, conducted the appropriate tests ruling out some of the risks, weighed the multitude of benefits, and then ultimately had decided that the benefits gained substantially outweighed the risks — and that as a result, no breach had occurred.
¶ 17. Because we are required to view the evidence in the light most favorable to the nonmoving party — which in the cáse would be Glenn — we hold that there remains a genuine issue of fact as to whether Dr. Peoples breached the standard of care by prescribing Coumadin to Aldridge. But the inquiry does not end here.

B, Proximate Causation

¶ 18. No citation of authority is necessary for the well-understood principle of negligence -law that a plaintiff may not recover without demonstrating that the defendant’s negligence was . a proximate cause of the plaintiffs damages. And “[i]n order for an act of negligence to proximately cause the damage, the fact finder must find that the negligence was both the cause in fact and legal cause of the damage.”[9]
¶ 19. A defendant’s negligence is the cause in fact “where the fact finder' concludes that, but for the defendant’s negligence, the injury would not have occurred.”[10] In other words, “the ’cause in fact of an injury is ‘that cause which, in natural and continuous sequence unbroken by any efficient intervening causé, produces the injury and without which the injury would not have occurred.’ ”[11] When a plaintiffs injuries are the result of the negligence of more than one tortfeasor, the test is “whether the negligence of a particular tortfeasor was a substantial factor in bringing about the harm.”[12] Further, “a defendant’s negligence which is found to be the cause in fact ... will also be the legal cause ... provided the damage is the type, or within the classification, of damage the negligent actor should reasonably expect (or foresee) to result from the negligent act.”[13]
*987 ¶ 20. Dr. Peoples correctly argues that Glenn failed to .put forth sufficient evidence to create a genuine issue of material fact as to whether Dr. Peoples’s act of prescribing Coumadin — even assuming for the sake , of this argument that it was a negligent act — proximately caused Aldridge’s injuries, phis clearly is demonstrated in the record before us.
¶ 21. Even if we were to assume that the ingestion of Oóümadin alone caused Aldridge’s hemorrhagic stroke — an assumption it may not at all be safe to make — still, Glenn presented no evidence that the Coumadin Aldridge was taking at the time of her stroke was in fact prescribed by Dr. Peoples. The “duration of action” for Coumadin — according to the general knowledge of the doctors and the manufacturer’s informational packet accompanying the drug — ranges from two to five days. Dr. Peoples discharged Al-dridge from his care on April 30, 2010, and accordingly, any Coumadin that he prescribed would have run its course by May 6, 2010, at the latest. Aldridge suffered her stroke nearly two months later, on June 25, 2014. Thus, her stroke cannot be attributed to the Coumadin prescribed by Dr. Peoples.
¶ 22. Indeed, all of the evidence presented shows that, for the nearly two-month period preceding Aldridge’s stroke, Dr. Jones issued the orders prescribing Coumadin. And Glenn presented no evidence to indicate that Dr. Jones’s decision to prescribe the drug was based on anything other than his own independent judgment. In fact, Plaintiffs expert Dr. Davey even conceded this much when he testified as follows:
Q. And in seeing the patients in the nursing home, do you monitor what medicines they take?
A.. Absolutely. That’s very important.
Q. And do you make decisions as to . what medicines they should be on?
A. Of course. ...
Q. Dr. Davey, if a patient is trans- ' ferred into yoür care' at a nursing home, do you evaluate the medicines that they’re on when they’re transferred 'into your cár'e?
A. Yes. It’s actually very common ... so, I do evaluate them and cut their medication list down to a smaller number if it’s at all possible, which it usually is.
Q. When patients are transferred into your care in a nursing home, do you have to report to their primary care physician?
A. No— generally there would then be no .contact.,
¶ 23. Dr. Davey further testified:
Q. ... When Dr. Jones took over Ms. Aldridge’s care, did he have a responsibility to make sure that it was appropriate for her to be on Couma-din?
A. I think so, yes....
Q. ... he also had a responsibility from a medical standpoint to make sure that was' appropriate, correct?
A. Right. He could have disagreed with Dr. Peoples.
Q. And that would been ' his call to make, correct?'
A. Yes...
Q. So as of 5-24-2010, the order for Ms. Aldridge to continue Coumadin came from Dr. Jones, didn’t it?
A. ... yes, he — by that time, he’s the one signing off on it....
Q., Dr. Jones had an obligation to make the determination of Coumadin was safe, correct?
A. Yes, that’s true. .
*988 ¶ 24, Consistent with this testimony— by the plaintiffs own expert — it was Dr. Jones’s responsibility to provide Aldridge’s medical care, including the prescription of any medicines. And for nearly two months, Dr.. Jones, nqt Dr.. Peoples, prescribed Coumadin for Aldridge. Logically, it follows that, if Coumadin alone caused Aldridge’s stroke, then the cause would be attributed to negligent prescription by Dr. Jones, not Dr. Peoples.
¶ 25. Dr. Davey — again, Plaintiffs own expert — opined that the stroke — or brain bleed — was caused by, or the result of Aldridge’s INR level being toxic at 3.7, or in other words, that her blood had been allowed to become too thin.'. Dr. Davey conceded that Aldridge’s ÍNR level was not toxic when she was discharged by Dr. Peoples in April 2010.- And after her discharge from Dr. People’s care, Aldridge’s INR levels were monitored by Dr. Jones, not Dr. Peoples, On this issue, Dr. Davey testified as follows:
Q. I’ll ask you this. Her INR level when she was discharged from St. Dominic wasn’t toxic, was it?
A. I don’t know. I doubt they would have discharged her with a high INR, but' I don’t know.
Q. Is 1.79 toxic?.
A. No.
¶ 26. Further, Dr. Davey acknowledged that Aldridge did not have a brain bleed after being in Dr. Peoples’s care by the following exchange:
Q. So by the time Ms. Aldridge was transferred into Dr. Jones’ care she did not have a brain bleed, correct?
A. Apparently not.
¶ 27. Dr. Davey’s testimony then continued to indicate that it'was the negligent monitoring of Aldridge’s Coumadin intake and her corresponding INR levels which caused and eventually led to the hemorrhagic stroke. On this issue, Dr. Davey testified as follows:
Q. And then you say it was poorly monitored, and I think we’ve already addressed this, but if that’s true, then that was not Dr. Peoples’ fault-in this case, was it?
A. The poor monitoring would have been ... in the nursing home....
Q. And we can’t say as we sit here today that if-'INR level would have been between two and three she still would have had a brain bleed, can we?
A. Of course, true....
Q. So can you say within a reasonable degree of medical certainty that this brain bleed would have occurred even if the Coumadin was properly monitored?
A. It was less likely,...
Q. So then — and I don’t mean to belabor the issue, you can’t say within a reasonable degree of medical certainty that had her Coumadin been .controlled that she would have bled out, correct?
A. .Right_
¶ 28. And Dr. Davey later testified:
Q. But as to the monitoring, your criticism goes to Dr. Jones and/or Trinity, correct—
A. Well—
Q. —assuming 5-30 was the last—
A. —as we’ve discussed, yes. I mean, I agree with what we’ve discussed and — about the monitoring of the INR....
Q. Sure.
A. ... I agree with you.
¶ 29. So, based on Plaintiffs proffered expert testimony, the mere' ingestion of Coumadin was not the culprit. Instead, Aldridge' suffered a hemorrhagic stroke *989 because her INR levels had been allowed to become toxic — and this was caused by Dr. Jones’s failure to properly monitor the Coumadin intake and INR levels..' Based on the foregoing discussion, we are of the opinion that Glenn failed to meet her burden as to the element of proximate causation.
CONCLUSION
¶ 30. In sum, Glenn failed to preserit sufficient evidence to create a genuine issue of material fact regarding causation, and the trial court, therefore, properly granted Dr. Peoplés’s motion for summary judgment. So, we affirm the judgment of the Hinds County Circuit Court.
¶ 31. AFFIRMED.
RANDOLPH, P.J., LAMAR, PIERCE AND . COLEMAN, JJ„ CONCUR. KITCHENS, 3., DISSENTS WITH SEPARATE WRITTEN OPINION JOINED BY KING, J- WALLER, C.J., NOT PARTICIPATING.

. Burleson v. Lathem, 968 So.2d 930, 932 (Miss.2007).

. Miss. R. Civ. P. 56(c).

. Duckworth v. Warren, 10 So.3d 433, 436 (Miss.2009).

. Miss. R. Civ. P. 56(e).

. Vaughn v. Miss. Baptist Med. Ctr., 20 So.3d 645, 650 (Miss.2009).

. Palmer v. Biloxi Reg'l Med. Ctr., Inc., 564 So.2d 1346, 1354 (Miss.1990) (quoting Phillips v. Hull, 516 So.2d 488, 491 (Miss.1987)).

. Braswell v. Stinnett, 99 So.3d 175, 179 (Miss.2012) (citing McCarty v. Mladineo, 636 So.2d 377, 381 (Miss.1994)).

. Braswell, 99 So.3d at 179.

. Glover ex rel. Glover v. Jackson State Univ., 968 So.2d 1267, 1277 (Miss.2007) (citing Dobbs, The Law of Torts, § 180 at 443 (2000)).

. Id.

. Id. (citing Gulledge v. Shaw, 880 So.2d 288, 293 (Miss.2004)).

. Id. at 1291 n. 11 (citing Dobbs, The Law of Torts, § 171 at 415 (2000)).

. Id. (citing Dobbs, The Law of Torts, § 180 at 443 (2000)).