# IN THE SUPREME COURT OF MISSISSIPPI

## NO. 2015-CA-00045-SCT

*DALTON TRIGG AND DR. STEPHEN D. TRIGG*

*v.*

*STEVEN FARESE, SR. AND FARESE, FARESE & FARESE, P.A.*

| | |
|---|---|
| DATE OF JUDGMENT: | 08/20/2014 |
| TRIAL JUDGE: | HON. L. BRELAND HILBURN |
| TRIAL COURT ATTORNEYS: | MATTHEW WADE GILMER |
| | H. SCOT SPRAGINS |
| COURT FROM WHICH APPEALED: | LAFAYETTE COUNTY CIRCUIT COURT |
| ATTORNEYS FOR APPELLANTS: | MATTHEW WADE GILMER |
| | BARRY W. GILMER |
| | JONATHAN DAVID NUESCH |
| | JOSEPH AARON CRONE |
| | RICHARD COLEMAN WILLIAMS |
| ATTORNEYS FOR APPELLEES: | LAWRENCE JOHN TUCKER, JR. |
| | H. SCOTT SPRAGINS |
| | RALPH EDWIN CHAPMAN |
| NATURE OF THE CASE: | CIVIL - LEGAL MALPRACTICE |
| DISPOSITION: | AFFIRMED IN PART AND REVERSED AND REMANDED IN PART - 11/29/2018 |
| MOTION FOR REHEARING FILED: | |
| MANDATE ISSUED: | |

**BEFORE RANDOLPH, P.J., KING AND ISHEE, JJ.**

**ISHEE, JUSTICE, FOR THE COURT:**

¶1. Dalton Trigg and his father, Dr. Stephen Trigg, sued Dalton's former criminal-defense attorney, Steven Farese Sr., alleging professional malpractice. The Lafayette County Circuit Court held that the claims were premature because Dalton had not yet secured postconviction relief from the underlying conviction, and it dismissed the complaint without prejudice.

¶2.     This case presents the question of whether a convicted criminal may sue his former defense attorney for negligently causing him to be convicted while that conviction still stands. We join the substantial majority of courts in holding that, because these allegations would entitle the plaintiff to relief from his underlying conviction, he must first pursue them through the criminal-justice process. In other words, a convict must "exonerate" himself by obtaining relief from his conviction or sentence before he may pursue a claim against his defense attorney for causing him to be convicted or sentenced more harshly than he should have been. To the extent prior decisions of this Court or the Court of Appeals suggest otherwise, they are overruled.

¶3.     But this holding extends only to claims that stem from allegations of professional malpractice. The Triggs' claim for an accounting of the substantial retainer paid to Dalton's attorney, to the extent it is just a fee dispute and does not depend on the quality of legal services rendered, should not have been dismissed. Finally, Dr. Trigg had standing to pursue the accounting claim because he claims he paid the retainer and is entitled to a refund of the unearned portion.

## FACTS AND PROCEDURAL HISTORY

¶4.     The following facts are drawn from the allegations in the Triggs' complaint, which, because of the procedural posture of this case, are taken as true. On September 10, 2011, Dalton drove his vehicle after drinking alcohol and collided with another vehicle. A fourteen-year-old passenger in the other vehicle suffered injuries to her lower extremities and

2

a laceration to her eyebrow. She fully recovered, allegedly free of any permanent injuries or restrictions. Dalton, however, received life-threatening injuries. He suffered brain damage and was incapacitated for some period of time after the accident. When Dr. Trigg learned Dalton had been drinking before the accident, he approached Farese to discuss legal representation for his son. Farese demanded an up-front retainer of $50,000.

¶5. The Triggs further allege Farese warranted that Dalton would incur only a misdemeanor charge and would not be sentenced to any jail time. Dr. Trigg paid the retainer in reliance on this guarantee, and he believed the payment created an attorney-client relationship between him and Farese. But Dalton was eventually indicted for aggravated DUI, a felony punishable by up to twenty-five years' imprisonment.[1] Farese then allegedly advised that if Dalton pled guilty to the felony charge, it would somehow be reduced to a misdemeanor and he would receive no jail time. Following this advice, Dalton pled guilty to the felony—but he ultimately received a ten-year sentence, with six years suspended and four years to serve. The four years to serve would be reduced to five years' probation after Dalton completed a long-term drug and alcohol treatment program.

¶6. Dalton finished the treatment program and was released from prison in February 2014—he spent roughly nine months incarcerated. He claims that during his time in prison, he was beaten by other inmates and suffered serious injuries. Unsatisfied with Farese's representation, Dalton and Dr. Trigg filed suit against Farese and his firm on April 1, 2014.

---

[1] *See* Miss. Code Ann. § 63-11-30(5) (Rev. 2013).

The Triggs alleged a variety of claims, all of which stemmed from Farese's representation of Dalton. Specifically, the Triggs styled their causes of action fraud, breach of contract, legal malpractice (negligence), accounting for money paid, and negligent infliction of emotional distress. Because of certain allegations in the complaint, Farese successfully moved to have the file temporarily sealed. That seal remains intact to the present day.

¶7. On April 14, 2014, the circuit-court judges for the Third Judicial District entered a sua sponte order of recusal. This Court then appointed Judge L. Breland Hilburn to preside as a special judge.

¶8. Farese then filed his answer, which also contained a motion to dismiss or, in the alternative, for summary judgment. Farese argued the complaint should be dismissed because Dr. Trigg lacked standing and Dalton had failed to first seek postconviction relief. On August 25, 2014, the circuit court dismissed the Triggs' complaint pursuant to "Rule 12 and/or Rule 56 of [the] Mississippi Rules of Civil Procedure" after reviewing "all of the pleadings, responses, affidavits[,] and authorities of law filed by the parties." In response, the Triggs filed a posttrial motion seeking to vacate the order of dismissal and to reinstate their claims. At the hearing on the motion to vacate, the circuit judge explained that his intent was to dismiss the complaint under Rule 12(b). And on December 11, 2014, the circuit court entered an order denying the Triggs' motion to vacate, reaffirming its dismissal of their complaint without prejudice and denying all other pending motions. The Triggs timely perfected this appeal.

4

**STANDARD OF REVIEW**

¶9.     "The standard of review for a trial court's grant or denial of a motion to dismiss is de novo." ***Long v. Vitkauskas***, 228 So. 3d 302, 304 (Miss. 2017).  This Court likewise reviews a circuit court's grant of summary judgment de novo.  ***Daniels v. Crocker***, 235 So. 3d 1, 6 (Miss. 2017).  As to standing, which raises jurisdictional issues, the standard of review is also de novo.  ***Hotboxxx, LLC v. City of Gulfport***, 154 So. 3d 21, 27 (Miss. 2015).

**DISCUSSION**

**1.  Affidavits on Motion to Dismiss**

¶10.     As a threshold issue, the Triggs complain the circuit court erroneously dismissed their complaint because it failed to explicitly exclude two affidavits which the Triggs themselves attached to their responses to the motion to dismiss.  The Triggs also rely on the circuit court's original order of dismissal, which was somewhat unclear as to whether the complaint was dismissed under Rule 12 of the Mississippi Rules of Civil Procedure or whether summary judgment was granted under Rule 56.  The order states that dismissal was under "Rule 12 and/or Rule 56 of [the] Mississippi Rules of Civil Procedure" and that the circuit court "considered all of the pleadings, responses, affidavits[,] and authorities of law filed by the parties."  At the hearing on the "motion to vacate," the circuit judge clarified his ruling:

> [I]t's obvious that I may have generated some misconception about the order [of dismissal] . . . .  It was the intent of the [c]ourt to enter an order of dismissal under Rule 12.  That order obviously sits.  There [were] undisputed facts set out in the pleadings as to whether or not a post-conviction relief had been sought by [Dalton].  It was also mentioned as being a Rule 56 summary judgment ruling by the [c]ourt.  The [c]ourt will amend the order to reflect at

5

this point in time it is a Rule 12 dismissal, and that there's really not a need for the [c]ourt to reach summary judgment at this point.

The circuit court then entered an order denying the motion to vacate which returned to the merits of the motion to dismiss and omitted any mention of the affidavits or summary judgment.

¶11. The Triggs argue that since the first order recites that the circuit court reviewed affidavits, the court was required to convert the motion to dismiss into a motion for summary judgment. Farese responds by pointing out that the circuit court had to review affidavits in order to determine one of the asserted bases for dismissal, whether Dr. Trigg had standing.

¶12. We agree that the circuit court was entitled to review Dr. Trigg's affidavit as it pertained to standing. The challenge was based on Rule 12(b)(1) of the Mississippi Rules of Civil Procedure. In *Schmidt v. Catholic Diocese of Biloxi*, 18 So. 3d 814, 822 (Miss. 2009), this Court explained the difference between facial attacks on subject-matter jurisdiction versus factual attacks. Facial attacks allege the court lacks jurisdiction as a matter of law, while a factual attack "requires resolution by the trial court of one or more factual disputes in order to determine subject matter jurisdiction." *Id.* (quoting *Roman Catholic Diocese v. Morrison*, 905 So. 2d 1213, 1220 (Miss. 2005)). "In a factual attack, matters outside the pleadings, such as testimony and affidavits, are considered." *Id.* Because the circuit court was faced with a factual attack as to Dr. Trigg's standing, it properly considered the affidavit submitted by Dr. Trigg on that point.

¶13. There is a second affidavit, however, which was also filed by the Triggs. It was

6

addressed to the underlying merits of the malpractice claim and clearly should have been excluded from consideration under Rule 12(b)(6). The Triggs contend that it was not excluded and that the circuit court was therefore required to convert the motion to one for summary judgment. They cite Rule 12(b), which provides that "[i]f . . . matters outside the pleading are presented to and not excluded by the court, the motion shall be treated as one for summary judgment and disposed of as provided in Rule 56." M.R.C.P. 12(b). Since the circuit court here was presented with an affidavit, which it did not expressly exclude, the Triggs argue it was error not to convert the motion to one for summary judgment.

¶14. The Triggs misunderstand what it means for the circuit court to exclude the affidavit—the circuit court is required only to exclude the affidavit from controlling its resolution of the 12(b)(6) motion. As this Court held in *Delta MK, LLC v. Mississippi Transportation Commission*, 57 So. 3d 1284, 1290 (Miss. 2011), conversion of the motion to dismiss into a motion for summary judgment is required when the circuit court *considers* matters outside the pleadings. And considered, as it used here, must mean more than simply reviewed or contemplated—for there to be any error in considering affidavits, the circuit court's judgment must depend on those affidavits. Or, as the United States Court of Appeals for the Tenth Circuit, construing the parallel federal rules, put it: any error in failing to convert the motion "is harmless if the dismissal can be justified under [Rule] 12(b)(6) standards without consideration of the matters outside the pleadings." *Lowe v. Town of Fairland*, 143 F.3d 1378, 1381 (10th Cir. 1998).

7

¶15. Here, the circuit court's reason for dismissing the complaint was Dalton Trigg's failure to allege he had secured postconviction relief—the circuit court accepted the allegations in the complaint as true. And the court dismissed the complaint without prejudice, as it should have under Rule 12(b)(6) for failure to state a claim; if the court had taken the motion as one for summary judgment, the decision would have been on the merits and the "dismissal" would have been a final judgment with prejudice. *See* M.R.C.P. 56(c). Despite the rote recitations in the circuit court's first order, it is apparent to us that the affidavit had nothing to do with the court's decision. Thus, it was not really considered, and the circuit court was under no obligation to convert the 12(b)(6) motion to dismiss for failure to state a claim into a motion for summary judgment. *See **Delta MK***, 57 So. 3d at 1290.

¶16. Even if the circuit court had been required to convert the motion to one for summary judgment, it still could have dismissed the complaint for failure to state a claim. Under Rule 12(h)(2), the defendants were entitled to raise the defense of failure to state a claim upon which relief can be granted, not only in their responsive pleading, but also "by motion for judgment on the pleadings, or at the trial on the merits." And under Rule 12(b)(6) itself, trial courts possess the authority to dismiss complaints which fail to state a claim—on the court's own motion. *See, e.g.*, ***Sparling v. Hoffman Const. Co.***, 864 F.2d 635, 638 (9th Cir. 1988); *see also* 5B Charles Alan Wright & Arthur R. Miller et al., *Federal Practice and Procedure* § 1357 (3d ed.), Westlaw (database updated Sept. 2018). The only limitation is that the court must proceed in a way that is fair to the parties. *See* 5B Wright & Miller § 1357. Since the

8

Triggs were on notice that the legal sufficiency of their complaint had been challenged and were given numerous opportunities to respond, we can find no unfairness in the dismissal.

¶17. Finally, we reiterate that our standard of review is de novo. The record gives no reason to suspect the circuit court based its decision on anything other than a careful study of the pleadings and the law. But under our standard of review it does not matter why the circuit court reached the result it did; we consider the legal sufficiency of the complaint anew. *See Triplett v. S. Hens, Inc.*, 238 So. 3d 1128, 1130 (Miss. 2018); *see also* M.R.C.P. 12(b)(6). If the circuit court reached the right result for the wrong reason, its judgment would be affirmed; if it reached the wrong result, the judgment would be reversed. *See Triplett*, 238 So. 3d at 1130. A circuit court is not even required to explain why it granted or denied a motion to dismiss. As the Court of Appeals has observed, the circuit court's explanation "may be helpful . . . to the parties and [the reviewing court]," but its "rationale is not controlling." *Satterfield v. State*, 158 So. 3d 380, 382 (Miss. Ct. App. 2015).

¶18. In summary, the issue of the legal sufficiency of the complaint is squarely before us on appeal. As we shall explain in due course, the trial court erred in dismissing one of the counts asserted in the complaint. But so far as the record reveals, any error in the circuit court's consideration of the affidavits was harmless.

### 2. Dr. Trigg's Standing

¶19. As to Dr. Trigg, the circuit court held that "[Dr.] Trigg's dissatisfaction in the performance of Farese [did] not create an attorney/client relationship." The circuit court

further held that "[Dr. Trigg] occupies no better position than his son, Dalton; a successful result of a [p]ost [c]onviction [r]elief petition must be obtained before [Dr. Trigg's] claim for legal malpractice against Farese will be actionable."

¶20. "Standing is a jurisdictional issue." ***Hotboxxx, LLC***, 154 So. 3d at 27. Standing depends on "whether the plaintiff asserts a 'colorable interest in the subject-matter of the litigation or experience[s] an adverse effect from the conduct of the defendant, or as otherwise provided by law.'" ***Id.*** So, "while standing in federal court requires an 'injury in fact,' standing in Mississippi courts is more liberal and requires a 'colorable interest in the subject matter.'" ***Id.*** This Court has defined a colorable interest as "whether the particular plaintiff had a right to judicial enforcement of a legal duty of the defendant or whether a party plaintiff can show in himself a present, existent actionable title or interest, and demonstrate that this right was complete at the time of the institution of the action." ***Id.***

¶21. The complaint alleged five causes of action—fraud, breach of contract, legal malpractice (negligence), accounting for money paid, and negligent infliction of emotional distress.[2] As further explained below, four of these causes are essentially legal-malpractice

---

[2] The Triggs submitted an amended complaint adding a sixth cause of action for breach of fiduciary duty. In their briefs on appeal, the Triggs assume the amended complaint is the relevant document; but it was filed after the answer and the record contains no order permitting the amendment. The amended complaint is therefore not properly before us because "[i]t is the responsibility of the movant to obtain a ruling from the court on motions filed by him and failure to do so constitutes a waiver of same." ***Martin v. State***, 354 So. 2d 1114, 1119 (Miss. 1978). At any rate, the result would be the same under the amended complaint because the breach of fiduciary duty claim just restates the other causes of action under a new label.

allegations and were properly dismissed because Dalton failed to first secure postconviction relief. These counts were properly dismissed regardless of whether Dalton's father also had standing to pursue them, and thus the issue of his standing is moot. Any further discussion would be purely academic. But the request for an accounting—which is essentially a fee dispute—survives.

¶22.     Dr. Trigg alleges he paid Farese's retainer and Farese failed to provide an accounting or refund the unearned portion of the fees. As explained below, a claim based on the quality of the representation is barred, but the accounting claim survives to the extent it alleges the Triggs paid for work that was just not done. No contract appears in the record, but Dr. Trigg alleges he paid the retainer and is entitled to a refund of the unearned portion. He has a colorable interest in the subject matter of the accounting claim, and he therefore has standing to pursue it. *See Hotboxxx, LLC*, 154 So. 3d at 27.

### 3.  The Malpractice Claims

¶23.     The Triggs asserted various causes of action in the complaint, but the circuit court focused on the legal malpractice allegation, which it saw as the fountainhead from which all the other counts derived. The circuit court dismissed the complaint by holding that a criminal defendant must secure postconviction relief before pursuing a criminal-defense malpractice claim. For authority, the circuit court relied on a case from another jurisdiction, *Gibson v. Trant*, 58 S.W.3d 103 (Tenn. 2001). We are not aware of any prior decisions of this Court or the Court of Appeals discussing whether a convicted criminal must first "exonerate"

11

himself before pursuing a malpractice claim against his defense attorney. In fact, reported criminal-malpractice decisions appear to have been rare at common law. *See Wiley v. City of San Diego*, 966 P.2d 983, 985 (Cal. 1998) (noting prominent scholars had found only a handful of reported criminal malpractice cases nationwide as of 1974). But malpractice suits against criminal-defense attorneys have exploded in recent years, and most states have responded by adopting some form of the exoneration rule. *See id.* Thus, we take this as an issue of first impression in Mississippi, and after due consideration, we find the reasons for adopting an exoneration rule persuasive.

¶24. We begin our discussion with the traditional elements of a legal-malpractice claim: "a plaintiff must prove by a preponderance of the evidence the existence of a lawyer-client relationship, negligence on the part of the lawyer in handling his client's affairs entrusted to him, and some injury proximately caused by the lawyer's negligence." *Estate of St. Martin v. Hixson*, 145 So. 3d 1124, 1128 (Miss. 2014).

¶25. The exoneration rule finds its justification mostly in that final element: the client must show that his attorney's negligence proximately caused his injuries. *Id.* Proximate cause requires that the attorney's negligence be both the cause in fact and the legal cause of the client's damages. *Glenn v. Peoples*, 185 So. 3d 981, 986 (Miss. 2015). In the specific context of a legal-malpractice action, the plaintiff "must show that, but for his attorney's negligence, he would have been successful in the prosecution or defense of the underlying action." *Id.* (citation omitted). This "ensures that attorneys are only held professionally

liable where their failures to adhere to the standard of care actually impacted the plaintiff's interests in the case." *Id.* at 843. The former client "must establish proximate cause by the so-called 'trial-within-a-trial' test." *Crist v. Loyacono*, 65 So. 3d 837, 842 (Miss. 2011).

¶26. Immediately resorting to the trial-within-a-trial test makes sense in an ordinary civil-malpractice allegation because there are generally no "do overs" for a client who has suffered a loss as a result of his own attorney's professional negligence. Criminal law, on the other hand, provides both a substantive remedy for ineffective assistance of counsel and a procedural means to get it, the appellate and postconviction-relief processes.

¶27. Criminal defendants have a constitutional right to counsel—and, as a necessary consequence, a constitutional right to effective assistance of counsel. *See Strickland v. Washington*, 466 U.S. 668, 686, 104 S. Ct. 2052, 80 L. Ed. 2d 674 (1984). One convicted of a crime or punished more severely than he should have been because of his attorney's negligence can raise the ineffectiveness of his counsel as substantive grounds for relief from his conviction or sentence; a petitioner is entitled to have his conviction set aside for ineffective assistance of counsel if he can show that "counsel's representation fell below an objective standard of reasonableness" "under prevailing professional norms" and that counsel's negligence "was prejudicial to the defense." *Strickland*, 466 U.S. at 688, 691-92. "The defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different. A reasonable probability is a probability sufficient to undermine confidence in the outcome." *Id.* at 694.

¶28.    The criminal process is "a more appropriate forum to present [these] claims."

*Morgano v. Smith*, 879 P.2d 735, 739 n.3 (Nev. 1994).  And

> a convicted defendant who cannot meet the standard of proving that there is
> a reasonable probability that, but for counsel's unprofessional errors, there
> would not have been a conviction, also cannot meet the higher burden of
> proving by a fair preponderance of the evidence in a later malpractice action
> that but for counsel's negligent conduct, there would not have been a
> conviction.

*Noske v. Friedberg*, 656 N.W.2d 409, 413-14 (Minn. Ct. App. 2003).

¶29.    Furthermore, before accepting a guilty plea, the circuit court is required to undertake an extensive colloquy with the defendant, face-to-face and in open court.  *See, e.g.*, *Hannah v. State*, 943 So. 2d 20, 25 (Miss. 2006).  One of the questions circuit courts routinely ask of the defendant is whether he is satisfied with his attorney's representation, and the court will generally refuse to accept a guilty plea if the answer is no.  *See, e.g.*, *Wilson v. State*, 81 So. 3d 1067, 1082-83 (Miss. 2012).  Before accepting the guilty plea, the circuit court must find that it is offered knowingly, intelligently, and voluntarily.  *Hannah*, 943 So. 2d at 25. Because of these (and other) safeguards, defense counsel is "strongly presumed to have rendered adequate assistance and made all significant decisions in the exercise of reasonable professional judgment." *Strickland*, 466 U.S. at 690.

¶30.    The principle of collateral estoppel provides that "[w]here a question of fact essential to a judgment is actually litigated and determined by a valid and final judgment, that determination is conclusive against the party against whom it was made in a subsequent suit on a different cause of action." *Jordan v. McKenna*, 573 So. 2d 1371, 1375 (Miss. 1990)

14

(citation omitted). One scholar called the attempted repudiation of a guilty plea for the purposes of civil litigation "the clearest case for such an estoppel." *See Gibson*, 58 S.W.3d at 114 (quoting *Ray v. Stone*, 952 S.W.2d 220, 224 (Ky. Ct. App. 1997) (quoting Geoffrey C. Hazard, *Revisiting the Second Restatement of Judgments; Issue Preclusion and Related Problems*, 66 Cornell L. Rev. 564, 578 (1981))). "Particularly galling is the situation where a criminal convicted on his own guilty plea seeks as plaintiff in a subsequent civil action to claim redress based on a repudiation of the confession. The effrontery or, as some might say it, *chutzpah*, is too much to take." *Id.* Thus, most other courts have concluded that "by operation of the doctrine of collateral estoppel, a valid criminal conviction acts as a bar to overturning that conviction in a civil damages suit." *Levine v. Kling*, 123 F.3d 580, 583 (7th Cir. 1997). This result has been reached by a substantial majority of courts that have considered the issue; "only a few courts have held to the contrary." *See Rosenberg v. Shostak*, 405 S.W.3d 8, 13-14 n.5 (Mo. Ct. App. 2013) (collecting authorities).

¶31. We note also that our Legislature has created a comprehensive scheme for a convicted criminal defendant to challenge that conviction on appeal or through postconviction relief. As the Legislature itself put it, the Mississippi Uniform Post-Conviction Collateral Relief Act is intended "to provide the courts of this state with an exclusive and uniform procedure for the collateral review of convictions and sentences." *See* Miss. Code Ann. § 99-39-3(1) (Rev. 2015). Permitting collateral relitigation of the validity of criminal convictions outside that framework "would undermine the effective administration of the judicial system."

15

***Rosenberg***, 405 S.W.3d at 15. Courts from other states with similar statutory schemes have gone so far as to say it would "shock the public conscience, engender disrespect for courts and generally discredit the administration of justice." ***Id.*** As the Oregon Supreme Court has observed,

> In our society, no other legal outcome of the trial process is so difficult to obtain [as a criminal conviction]. Yet, to allow a person convicted of a criminal offense to sue that person's lawyer without having first overturned the conviction would mean that the courts would be permitting relitigation of a matter that is supposed to be settled: The complaining party is deemed by the law to be guilty. The panoply of protections accorded to the criminally accused (including direct appeal and post-conviction relief) is so inclusive, and the significance of a conviction so important to vindication of the rule of law, that it would appear most unusual to permit a person to prosecute a legal malpractice action premised on some flaw in the process that led to that person's conviction at the same time that the person's conviction remained valid for all other purposes. In other words, while the conviction and sentence remain valid for all other purposes, it is inappropriate to treat a complaining convicted offender as having been "harmed" in a legally cognizable way by that conviction.

***Stevens v. Bispham***, 851 P.2d 556, 562 (Or. 1993). Just as it is in Oregon, the public policy of this State is "to treat any person who has been convicted of any criminal offense as validly convicted unless and until the person's conviction has been reversed, whether on appeal or through post-conviction relief, or the person otherwise has been exonerated." ***Id.*** at 561.

¶32.   Another public-policy interest is in facilitating the practical and effective administration of the court system and the criminal justice process. Requiring exoneration "promotes judicial economy because many issues litigated in the quest for post-conviction relief will be duplicated in the legal malpractice claim." ***Gibson***, 58 S.W.3d at 114. It also

helps "prevent a flood of nuisance litigation" and "encourag[es] the representation of criminal defendants," since criminal defendants are often indigent and representing them is rarely lucrative. **Barker v. Capotosto**, 875 N.W.2d 157, 163 (Iowa 2016). Moreover, the exoneration rule "encourag[es] the thorough representation of criminal defendants" by reducing "the practice of defensive law, in which lawyers spend time and energy attempting to insulate their trial court decisions from attack in a later malpractice case." **Gibson**, 58 S.W.3d at 115 (citation omitted). And since a malpractice suit waives attorney-client privilege, the exoneration rule helps avoid the specter of a former defense attorney revealing "privileged or other evidence in his or her defense" to the malpractice suit that might later be used against the former client in subsequent criminal proceedings. *See* **Shaw v. State**, 816 P.2d 1358, 1361 (Alaska 1991). It is also desirable to allow "a criminal defendant with a valid post-conviction relief claim to pursue that remedy without the distraction of also filing a legal malpractice claim." *See* **id.**

¶33.    As the Oregon Supreme Court noted in **Stevens v. Bispham**, 851 P.2d 556, 560 (Or. 1993), "[l]egal malpractice is a common-law tort claim." Thus, "[i]n the absence of any pertinent legislation, it is for this court to define what constitutes legally cognizable harm in a tort case." **Id.** And "the choice of what constitutes legally cognizable harm is a policy choice." **Id.** We agree, and we hereby adopt the majority rule in other states requiring exoneration as a prerequisite to a criminal malpractice action.

¶34.    To be clear, when we say a defendant must be "exonerated," we mean he must obtain

17

a more favorable disposition of his conviction or sentence through direct appeal, postconviction relief, habeas corpus, or similar means within the criminal justice process.[3] At that point, the malpractice suit may be initiated even if the underlying criminal case has not yet been finally resolved. We choose reversal or vacation rather than final disposition because many criminal charges, when remanded for a new trial, are not actually retried—and there is no statute of limitations for many serious offenses in Mississippi, and thus those charges may never be finally resolved. *See* Miss. Code Ann. § 99-1-5 (Rev. 2015). This would effectively deny malpractice suits to many of those convicted of serious offenses. *See Silver v. Brodeur*, 682 N.E.2d 811, 818 (Ind. Ct. App. 1997). Our definition of exoneration as reversal establishes a bright-line rule that is not "contingent on whether the State decides to continue or revive prosecution of the defendant, a decision that may be made promptly or never, depending on whether there is pressure from a statute of limitations." *Mashaney v. Bd. of Indigents' Def. Servs.*, 355 P.3d 667, 677 (Kan. 2015).

¶35. But if the prosecution is resumed after a malpractice suit has been filed, the trial court should stay the malpractice action until the underlying criminal proceedings are resolved. If the defendant is ultimately convicted of the same offense on remand, he obviously cannot show that his first attorney's negligence proximately caused his first conviction, because of collateral estoppel. *See Jordan v. McKenna*, 573 So. 2d 1371, 1375 (Miss. 1990). It follows

---

[3] One court suggested a better name for the relief required would be "vindication," but we use exoneration because many other courts have used it. *See Mashaney v. Bd. of Indigents' Def. Servs.*, 355 P.3d 667, 673-74 (Kan. 2015).

that if he is convicted of a lesser offense, he can only show damages stemming from the original punishment if he has already suffered punishment in excess of the sentence he receives on remand. And if he is sentenced on remand to time served, he has no damages.

¶36. Some courts, a majority even, go further than exoneration in the criminal proceedings and require a malpractice claimant prove he is actually innocent of the charges, sometimes including lesser-included offenses or other offenses that might have been charged from the transaction at issue. *See Barker*, 875 N.W.2d at 161-62 (surveying cases). At least one court has adopted a similar rule but put the burden on the defendant by holding that the plaintiff's guilt is an affirmative defense barring the guilty plaintiff from collecting any damages resulting from his conviction. *See Shaw v. State*, 861 P.2d 566, 571-73 (Alaska 1993). These courts reason that the true proximate cause of a criminal-malpractice plaintiff's damages is his own guilt, that a guilty criminal has no legally protected interest in his liberty, and that any negligence by a defense attorney is legally superseded by the defendant's own criminal conduct. *See Barker*, 875 N.W.2d at 162-163; *Shaw*, 861 P.2d 566 at 572.

¶37. The procedural posture of today's case does not require this Court to decide whether or not to adopt a per se actual innocence rule. We leave that question for another day, but we observe, as the *Barker* court did, that a malpractice plaintiff "who was factually guilty of the crime for which he or she was convicted . . . will likely confront significant causation issues" even without a per se rule actual innocence rule. *Barker*, 875 N.W.2d at 166.

¶38. Next, we address the operation of the statute of limitations. In prior decisions, both

19

this Court and the Court of Appeals have rejected the claims of successful postconviction relief claimants that the statute of limitations for a malpractice claim began to run upon their achieving postconviction relief. Instead, we adopted the Court of Appeals' prior holding that the statute begins to run when the plaintiff "learns, or through reasonable diligence should have learned of his counsel's negligence." *Bradley v. Jordan*, 182 So. 3d 439, 441 (Miss. 2016) (quoting *Hymes v. McIlwain*, 856 So. 2d 416, 418 (Miss. Ct. App. 2003)). This statement was actually misleading, because our general statute of limitations is tolled only when the *injury* is latent, not its cause. *See Angle v. Koppers*, 42 So. 3d 1, 5-7 (Miss. 2010). Thus it would have been more correct to have said in *Bradley* that the statute begins to run at the time of conviction. But the distinction made no difference in *Bradley* or *Hymes*, as the real issue in those cases was whether the statute of limitations was tolled during appeals or postconviction proceedings; we held that it was not. *See Bradley*, 182 So. 3d at 441.

¶39.    *Bradley* and *Hymes* are untenable after today's decision because they were premised on the assumption that exoneration was not an element of a criminal-defense malpractice claim. If *Bradley* were paired with the exoneration rule, it would operate as de facto bar to many meritorious criminal-malpractice actions, as successful postconviction proceedings often take more than three years to work their way to a final disposition even if immediately pursued after conviction.

¶40.    Most other courts with an exoneration rule have found that exoneration essentially becomes an element of the criminal-malpractice cause of action and that the cause of action

20

accrues only after the malpractice plaintiff is exonerated of the underlying criminal charges. *See Noske v. Friedberg*, 656 N.W.2d 409, 414 (Minn. Ct. App. 2003) (surveying cases). These courts find this result appealing because it establishes a bright-line rule that can easily be applied. *See Mashaney v. Bd. of Indigents' Def. Servs.*, 355 P.3d 667, 674 (Kan. 2015)

¶41. The Kansas Supreme Court, in reaching this result, relied on its prior holdings that "[a] cause of action accrues when the right to institute and maintain a suit arises, or when there is a demand capable of present enforcement" and the "true test of accrual determines point at which plaintiff could first have filed, prosecuted action to successful conclusion." *See id.* (citations and internal quotation marks omitted). Existing Mississippi caselaw has held the same. A cause of action accrues "when it comes into existence as an enforceable claim, that is, when the right to sue becomes vested." *Weathers v. Metro. Life Ins. Co.*, 14 So. 3d 688, 692 (Miss. 2009) (quoting *Bullard v. Guardian Life Ins. Co. of Am.*, 941 So. 2d 812, 815 (Miss. 2006)). Put another way, "the statute of limitations begins to run when all the elements of a tort, or cause of action, are present." *Id.* (internal quotation marks omitted) (quoting *Caves v. Yarbrough*, 991 So. 2d 142, 147 (Miss. 2008)).

¶42. Courts adopting the accrual rule further analogize the criminal-malpractice claim to one for malicious prosecution, which accrues only when the prosecution proceedings are terminated in the malicious-prosecution plaintiff's favor. *See, e.g.*, *Shaw v. State*, 816 P.2d 1358, 1362 (Alaska 1991). Again, the same is true in Mississippi. *See Joiner Ins. Agency v. Principal Cas. Ins.*, 684 So. 2d 1242, 1244 (Miss. 1996). Similarly, the United States

21

Supreme Court has held that an exonerated convict's claims under § 1983 accrue at the time of exoneration rather than conviction. *See Heck v. Humphrey*, 512 U.S. 477, 489-90, 114 S. Ct. 2364, 129 L. Ed. 2d 383 (1994).

¶43. Still, we acknowledge that a substantial minority of courts have taken a different tack, which is often called the "two-track" approach. *See Noske*, 656 N.W.2d at 414-15 (surveying cases). Under the two-track approach, the statute of limitations on the malpractice claim generally begins to run upon the underlying conviction. Since exoneration often cannot be obtained within the statute of limitations for the malpractice claim, the would-be malpractice plaintiff is allowed to file his malpractice suit averring that he is in the process of obtaining postconviction relief. The trial court then stays the malpractice case until the postconviction relief claim is disposed of. *See id.*

¶44. The two-track approach has the advantage of putting the defense attorney on notice of the claims against him, but it comes with substantial administrative and practical costs. It would " require every convicted defendant who seeks relief from a conviction . . . to also file a legal-malpractice action or risk later having the action be time-barred." *Id.* at 416. Considering the volume of criminal appeals and postconviction petitions, the burden on trial courts to administer these innumerable, speculative malpractice claims would obviously be substantial. And the two-track approach further creates this "invitation to bring litigation, including the attendant burden and expense placed on finite judicial resources as well as on the parties, for cases in which no justiciable controversy currently exists or may ever exist."

22

*Id.* (citation omitted).

¶45.    We agree with the *Noske* court that the burdens of the two-track approach outweigh the benefits.  We therefore overrule *Bradley* and *Hymes* and adopt the majority rule that the criminal malpractice claim accrues and begins to run on the date of exoneration, as defined above.  We recognize that this holding creates a somewhat unique situation in that the accrual of the cause of action—and the extent of the damages—depends on the plaintiff's diligence in pursuing his postconviction remedies.  But we think these concerns can adequately be addressed by the application of two familiar principles of law.  First, the plaintiff has a duty to mitigate his damages.  *See Wall v. Swilley*, 562 So. 2d 1252, 1258 (Miss. 1990).  Any damages that can be shown by the defendant to result from the malpractice plaintiff's unreasonable delay in pursuing his exoneration from the underlying criminal charges cannot be said to have been caused by the defendant attorney.  Second, the doctrine of laches bars suit when the plaintiff's unreasonable delay "results in injustice or disadvantage to another." *Bolden v. Gatewood*, 250 Miss. 93, 119, 164 So. 2d 721, 732 (1964).  While we have previously held that laches ordinarily has no application when the statute of limitations has not yet run, *Greenlee v. Mitchell*, 607 So. 2d 97, 111 (Miss. 1992), that holding does not extend to the peculiar situation created today.

¶46.    Finally, we turn to the specific causes of action asserted in the Triggs' complaint.  Addressing these claims under Rule 12(b)(6), the question is whether the complaint stated a claim upon which relief may be granted.  To do so, the Triggs were required to provide (1)

a short and plain statement of the claim for relief; and (2) a demand for judgment for the relief to which they claim entitlement.  M.R.C.P. 8(a).  In assessing the legal sufficiency of the complaint, all factual allegations must be taken as true, and dismissal is improper unless it "appear[s] to a certainty that the plaintiff[s] [are] entitled to no relief under any set of facts that could be proved in support of the claim." *Crum v. City of Corinth*, 183 So. 3d 847, 850-51 (Miss. 2016) (internal quotations omitted).

¶47.    The complaint alleged five causes of action, which it labeled fraud, breach of contract, legal malpractice (negligence), accounting for money paid, and negligent infliction of emotional distress.  The malpractice and negligent-infliction-of-emotional-distress claims are clearly founded on allegations of professional malpractice.  Despite the label, the breach-of-contract count also sounds in the tort of professional negligence: it alleges Farese breached the contract by negligently performing his duties as a defense attorney.  Likewise, the claim of fraud is addressed to the correctness of Farese's legal judgment and is therefore just a malpractice claim couched as an intentional tort; this claim also requires exoneration before it may be pursued.  *See Greathouse v. McConnell*, 982 S.W.2d 165, 172 (Tex. App. 1998).  All of these claims are barred by Dalton's failure to secure exoneration prior to filing suit.

¶48.    But the cause of action for an accounting is different.  The Triggs allege Farese took a $50,000 retainer to defend Dalton, but that Farese never accounted for the money and did not actually earn it.  To the extent this claim does not depend on the quality of the services rendered, it is a mere fee dispute and should not have been dismissed.  *See Labovitz v.*

*Feinberg*, 713 N.E.2d 379, 385 (Mass. App. Ct. 1999).

## CONCLUSION

¶49.    In summary, we hold that a convicted criminal must first "exonerate" himself through the criminal-justice process before suing his defense attorney for professional negligence in causing his conviction.  Here, Dalton Trigg admits he did not secure relief from his conviction, and thus the malpractice-based claims against his attorney were properly dismissed.  But to the extent the Triggs allege they were charged for work not actually performed, the claim should not have been dismissed.  Thus, we affirm the judgment in part, reverse it in part, and remand the case for further proceedings consistent with this opinion.

¶50.    **AFFIRMED IN PART AND REVERSED AND REMANDED IN PART.**

**RANDOLPH AND KITCHENS, P.JJ., KING, COLEMAN, MAXWELL AND BEAM, JJ., CONCUR.  WALLER, C.J., AND CHAMBERLIN, J., NOT PARTICIPATING.**